# DUN & BRADSTREET, INC. *v.* GREENMOSS BUILDERS, INC.

No. 83–18.   Argued March 21, 1984—Reargued October 3, 1984—Decided
June 26, 1985

750

POWELL, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST and O'CONNOR, JJ., joined. BURGER, C. J., *post*, p. 763, and WHITE, J., *post*, p. 765, filed opinions concurring in the judgment. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 774.

*Gordon Lee Garrett, Jr.*, reargued the cause for petitioner. With him on the briefs were *Hugh M. Dorsey, Jr., David J. Bailey, William B. B. Smith, Peter J. Monte*, and *A. Buffum Lovell.*

*Thomas F. Heilmann* reargued the cause and filed briefs for respondent.*

*Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg, George Kaufmann,* and *Laurence Gold;* for Dow Jones & Co., Inc., by *Robert D. Sack* and *Frederick T. Davis;* for the Information Industry Association by *Richard E. Wiley, Lawrence W. Secrest III, Michael Yourshaw,* and *Patricia M. Reilly;* and for the Washington Post by *David E. Kendall* and *Kevin T. Baine.*

*William E. Murane* filed briefs for Sunward Corp. as *amicus curiae* urging affirmance.

JUSTICE POWELL announced the judgment of the Court and delivered an opinion, in which JUSTICE REHNQUIST and JUSTICE O'CONNOR joined.

In *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), we held that the First Amendment restricted the damages that a private individual could obtain from a publisher for a libel that involved a matter of public concern. More specifically, we held that in these circumstances the First Amendment prohibited awards of presumed and punitive damages for false and defamatory statements unless the plaintiff shows "actual malice," that is, knowledge of falsity or reckless disregard for the truth. The question presented in this case is whether this rule of *Gertz* applies when the false and defamatory statements do not involve matters of public concern.

## I

Petitioner Dun & Bradstreet, a credit reporting agency, provides subscribers with financial and related information about businesses. All the information is confidential; under the terms of the subscription agreement the subscribers may not reveal it to anyone else. On July 26, 1976, petitioner sent a report to five subscribers indicating that respondent, a construction contractor, had filed a voluntary petition for bankruptcy. This report was false and grossly misrepresented respondent's assets and liabilities. That same day, while discussing the possibility of future financing with its bank, respondent's president was told that the bank had received the defamatory report. He immediately called petitioner's regional office, explained the error, and asked for a correction. In addition, he requested the names of the firms that had received the false report in order to assure them that the company was solvent. Petitioner promised to look into the matter but refused to divulge the names of those who had received the report.

After determining that its report was indeed false, petitioner issued a corrective notice on or about August 3, 1976,

to the five subscribers who had received the initial report. The notice stated that one of respondent's former employees, not respondent itself, had filed for bankruptcy and that respondent "continued in business as usual." Respondent told petitioner that it was dissatisfied with the notice, and it again asked for a list of subscribers who had seen the initial report. Again petitioner refused to divulge their names.

Respondent then brought this defamation action in Vermont state court. It alleged that the false report had injured its reputation and sought both compensatory and punitive damages. The trial established that the error in petitioner's report had been caused when one of its employees, a 17-year-old high school student paid to review Vermont bankruptcy pleadings, had inadvertently attributed to respondent a bankruptcy petition filed by one of respondent's former employees. Although petitioner's representative testified that it was routine practice to check the accuracy of such reports with the businesses themselves, it did not try to verify the information about respondent before reporting it.

After trial, the jury returned a verdict in favor of respondent and awarded $50,000 in compensatory or presumed damages and $300,000 in punitive damages. Petitioner moved for a new trial. It argued that in *Gertz* v. *Robert Welch, Inc., supra,* at 349, this Court had ruled broadly that "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth," and it argued that the judge's instructions in this case permitted the jury to award such damages on a lesser showing. The trial court indicated some doubt as to whether *Gertz* applied to "non-media cases," but granted a new trial "[b]ecause of . . . dissatisfaction with its charge and . . . conviction that the interests of justice require[d]" it. App. 26.

The Vermont Supreme Court reversed. 143 Vt. 66, 461 A. 2d 414 (1983). Although recognizing that "in certain instances the distinction between media and nonmedia defend-

ants may be difficult to draw," the court stated that "no such difficulty is presented with credit reporting agencies, which are in the business of selling financial information to a limited number of subscribers who have paid substantial fees for their services." *Id.*, at 73, 461 A. 2d, at 417. Relying on this distinguishing characteristic of credit reporting firms, the court concluded that such firms are not "the type of media worthy of First Amendment protection as contemplated by *New York Times [Co. v. Sullivan,* 376 U. S. 254 (1964),] and its progeny." *Id.*, at 73–74, 461 A. 2d, at 417–418. It held that the balance between a private plaintiff's right to recover presumed and punitive damages without a showing of special fault and the First Amendment rights of "nonmedia" speakers "must be struck in favor of the private plaintiff defamed by a nonmedia defendant." *Id.*, at 75, 461 A. 2d, at 418. Accordingly, the court held "that as a matter of federal constitutional law, the media protections outlined in *Gertz* are inapplicable to nonmedia defamation actions." *Ibid.*

Recognizing disagreement among the lower courts about when the protections of *Gertz* apply,[1] we granted certiorari. 464 U. S. 959 (1983). We now affirm, although for reasons different from those relied upon by the Vermont Supreme Court.

## II

As an initial matter, respondent contends that we need not determine whether *Gertz* applies in this case because the instructions, taken as a whole, required the jury to find "actual

---

[1] Compare *Denny* v. *Mertz,* 106 Wis. 2d 636, 318 N. W. 2d 141, cert. denied, 459 U. S. 883 (1982) (*Gertz* inapplicable to private figure suits against nonmedia defendants); *Stuempges* v. *Parke, Davis & Co.,* 297 N. W. 2d 252 (Minn. 1980) (same); *Rowe* v. *Metz,* 195 Colo. 424, 579 P. 2d 83 (1978) (same); and *Harley-Davidson Motorsports, Inc.* v. *Markley,* 279 Ore. 361, 568 P. 2d 1359 (1977) (same), with *Antwerp Diamond Exchange, Inc.* v. *Better Business Bureau,* 130 Ariz. 523, 637 P. 2d 733 (1981) (*Gertz* applicable in such situations); and *Jacron Sales Co.* v. *Sindorf,* 276 Md. 580, 350 A. 2d 688 (1976) (same).

malice" before awarding presumed or punitive damages.[2] The trial court instructed the jury that because the report was libelous *per se,* respondent was not required "to prove actual damages . . . since damage and loss [are] conclusively presumed." App. 17; accord, *id.,* at 19. It also instructed the jury that it could award punitive damages only if it found "actual malice." *Id.,* at 20. Its only other relevant instruction was that liability could not be established unless respondent showed "malice or lack of good faith on the part of the Defendant." *Id.,* at 18. Respondent contends that these references to "malice," "lack of good faith," and "actual malice" required the jury to find knowledge of falsity or reckless disregard for the truth—the "actual malice" of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964)—before it awarded presumed or punitive damages.

We reject this claim because the trial court failed to define any of these terms adequately. It did not, for example, provide the jury with any definition of the term "actual malice." In fact, the only relevant term it defined was simple "malice."[3] And its definitions of this term included not only the *New York Times* formulation but also other concepts such as

---

[2] Respondent also argues that petitioner did not seek the protections outlined in *Gertz* before the jury instructions were given and that the issue therefore was not preserved for review. Since the Vermont Supreme Court considered the federal constitutional issue properly presented and decided it, there is no bar to our review. See *Orr* v. *Orr,* 440 U. S. 268, 274–275 (1979).

[3] The full instruction on malice reads as follows:

"If you find that the Defendant acted in a bad faith towards the Plaintiff in publishing the Erroneous Report, *or* that Defendant intended to injure the Plaintiff in its business, *or* that it acted in a willful, wanton or reckless disregard of the rights and interests of the Plaintiff, the Defendant has acted maliciously and the privilege is destroyed. *Further,* if the Report was made with reckless disregard of the possible consequences, *or* if it was made with the knowledge that it was false *or* with reckless disregard of its truth or falsity, it was made with malice." App. 18–19 (emphasis added).

"bad faith" and "reckless disregard of the [statement's] possible consequences." App. 19. The instructions thus permitted the jury to award presumed and punitive damages on a lesser showing than "actúal malice." Consequently, the trial court's conclusion that the instructions did not satisfy *Gertz* was correct, and the Vermont Supreme Court's determination that *Gertz* was inapplicable was necessary to its decision that the trial court erred in granting the motion for a new trial. We therefore must consider whether *Gertz* applies to the case before us.

## III

In *New York Times Co.* v. *Sullivan, supra,* the Court for the first time held that the First Amendment limits the reach of state defamation laws. That case concerned a public official's recovery of damages for the publication of an advertisement criticizing police conduct in a civil rights demonstration. As the Court noted, the advertisement concerned "one of the major public issues of our time." *Id.,* at 271. Noting that "freedom of expression *upon public questions* is secured by the First Amendment," *id.,* at 269 (emphasis added), and that "debate *on public issues* should be uninhibited, robust, and wide-open," *id.,* at 270 (emphasis added), the Court held that a public official cannot recover damages for defamatory falsehood unless he proves that the false statement was made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *id.,* at 280. In later cases, all involving public issues, the Court extended this same constitutional protection to libels of public figures, *e. g., Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967), and in one case suggested in a plurality opinion that this constitutional rule should extend to libels of any individual so long as the defamatory statements involved a "matter of public or general interest," *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 44 (1971) (opinion of BRENNAN, J.).

In *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), we held that the protections of *New York Times* did not extend as far as *Rosenbloom* suggested. *Gertz* concerned a libelous article appearing in a magazine called American Opinion, the monthly outlet of the John Birch Society. The article in question discussed whether the prosecution of a policeman in Chicago was part of a Communist campaign to discredit local law enforcement agencies. The plaintiff, Gertz, neither a public official nor a public figure, was a lawyer tangentially involved in the prosecution. The magazine alleged that he was the chief architect of the "frame-up" of the police officer and linked him to Communist activity. Like every other case in which this Court has found constitutional limits to state defamation laws, *Gertz* involved expression on a matter of undoubted public concern.

In *Gertz*, we held that the fact that expression concerned a public issue did not by itself entitle the libel defendant to the constitutional protections of *New York Times*. These protections, we found, were not "justified solely by reference to the interest of the press and broadcast media in immunity from liability." 418 U. S., at 343. Rather, they represented "an accommodation between [First Amendment] concern[s] and the limited state interest present in the context of libel actions brought by public persons." *Ibid.* In libel actions brought by private persons we found the competing interests different. Largely because private persons have not voluntarily exposed themselves to increased risk of injury from defamatory statements and because they generally lack effective opportunities for rebutting such statements, *id.*, at 345, we found that the State possessed a "strong and legitimate . . . interest in compensating private individuals for injury to reputation." *Id.*, at 348–349. Balancing this stronger state interest against the same First Amendment interest at stake in *New York Times*, we held that a State could not allow recovery of presumed and punitive damages absent a showing of "actual malice." Nothing in our opinion,

however, indicated that this same balance would be struck regardless of the type of speech involved.[4]

## IV

We have never considered whether the *Gertz* balance obtains when the defamatory statements involve no issue of public concern. To make this determination, we must employ the approach approved in *Gertz* and balance the State's interest in compensating private individuals for injury to their reputation against the First Amendment interest in protecting this type of expression. This state interest is identical to the one weighed in *Gertz*. There we found that it was "strong and legitimate." 418 U. S., at 348. A State should not lightly be required to abandon it,

> "for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name

---

[4] The dissent states that "[a]t several points the Court in *Gertz* makes perfectly clear [that] the restrictions of presumed and punitive damages were to apply in all cases." *Post*, at 785, n. 11. Given the context of *Gertz*, however, the Court could have made "perfectly clear" only that these restrictions applied in cases involving *public speech*. In fact, the dissent itself concedes that *"Gertz . . . focused largely on defining the circumstances under which protection of the central First Amendment value of robust debate of public issues* should mandate plaintiffs to show actual malice to obtain a judgment and actual damages . . . ." *Post*, at 777 (original emphasis).

The dissent also incorrectly states that *Gertz* "specifically held," *post*, at 779, 793, both "that the award of presumed and punitive damages on less than a showing of actual malice is not a narrowly tailored means to achieve the legitimate state purpose of protecting the reputation of private persons . . . ," *post*, at 779, and that "unrestrained presumed and punitive damages were 'unnecessarily' broad . . . in relation to the legitimate state interests," *post*, at 793–794. Although the Court made both statements, it did so only within the context of public speech. Neither statement controls here. What was "not . . . narrowly tailored" or was "'unnecessarily' broad" with respect to public speech is not necessarily so with respect to the speech now at issue. Properly understood, *Gertz* is consistent with the result we reach today.

'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. . . .' *Rosenblatt* v. *Baer*, 383 U. S. 75, 92 (1966) (concurring opinion)." *Id.*, at 341.

The First Amendment interest, on the other hand, is less important than the one weighed in *Gertz*. We have long recognized that not all speech is of equal First Amendment importance.[5] It is speech on "'matters of public concern'"

---

[5] This Court on many occasions has recognized that certain kinds of speech are less central to the interests of the First Amendment than others. Obscene speech and "fighting words" long have been accorded no protection. *Roth* v. *United States*, 354 U. S. 476, 483 (1957); *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942); cf. *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 591–592 (1952) (advocating violent overthrow of the Government is unprotected speech); *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 716 (1931) (publication of troopship sailings during wartime may be enjoined). In the area of protected speech, the most prominent example of reduced protection for certain kinds of speech concerns commercial speech. Such speech, we have noted, occupies a "subordinate position in the scale of First Amendment values." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 456 (1978). It also is more easily verifiable and less likely to be deterred by proper regulation. *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771–772 (1976). Accordingly, it may be regulated in ways that might be impermissible in the realm of noncommercial expression. *Ohralik, supra*, at 456; *Central Hudson Gas & Elec. Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 562–563 (1980).

Other areas of the law provide further examples. In *Ohralik* we noted that there are "[n]umerous examples . . . of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, corporate proxy statements, the exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees." 436 U. S., at 456 (citations omitted). Yet similar regulation of political speech is subject to the most rigorous scrutiny. See *Brown* v. *Hartlage*, 456 U. S. 45, 52–53 (1982); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279, n. 19

that is "at the heart of the First Amendment's protection." *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 776 (1978), citing *Thornhill* v. *Alabama*, 310 U. S. 88, 101 (1940). As we stated in *Connick* v. *Myers*, 461 U. S. 138, 145 (1983), this "special concern [for speech on public issues] is no mystery":

> "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' *Roth* v. *United States*, 354 U. S. 476, 484 (1957); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 269 (1964). '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the '"highest rung of the hierarchy of First Amendment values,"' and is entitled to special protection. *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 913 (1982); *Carey* v. *Brown*, 447 U. S. 455, 467 (1980)."

In contrast, speech on matters of purely private concern is of less First Amendment concern. *Id.*, at 146–147. As a number of state courts, including the court below, have recognized, the role of the Constitution in regulating state libel law is far more limited when the concerns that activated *New York Times* and *Gertz* are absent.[6] In such a case,

---

(1964); *Buckley* v. *Valeo*, 424 U. S. 1, 14 (1976). Likewise, while the power of the State to license lawyers, psychiatrists, and public school teachers—all of whom speak for a living—is unquestioned, this Court has held that a law requiring licensing of union organizers is unconstitutional under the First Amendment. *Thomas* v. *Collins*, 323 U. S. 516 (1945); see also *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 44 (1971) (opinion of BRENNAN, J.) ("the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern").

[6] As one commentator has remarked with respect to "the case of a commercial supplier of credit information that defames a person applying for

> "[t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press. The facts of the present case are wholly without the First Amendment concerns with which the Supreme Court of the United States has been struggling." *Harley-Davidson Motorsports, Inc.* v. *Markley*, 279 Ore. 361, 366, 568 P. 2d 1359, 1363 (1977).

Accord, *Rowe* v. *Metz*, 195 Colo. 424, 426, 579 P. 2d 83, 84 (1978); *Denny* v. *Mertz*, 106 Wis. 2d 636, 661, 318 N. W. 2d 141, 153, cert. denied, 459 U. S. 883 (1982).

While such speech is not totally unprotected by the First Amendment, see *Connick* v. *Myers, supra,* at 147, its protections are less stringent. In *Gertz,* we found that the state interest in awarding presumed and punitive damages was not "substantial" in view of their effect on speech at the core of First Amendment concern. 418 U. S., at 349. This interest, however, *is* "substantial" relative to the incidental effect these remedies may have on speech of significantly less constitutional interest. The rationale of the common-law rules has been the experience and judgment of history that "proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication, it is all but certain that serious harm has resulted in fact." W. Prosser, Law of Torts § 112, p. 765 (4th ed. 1971); accord, *Rowe* v. *Metz, supra,* at 425–426, 579 P. 2d, at 84; Note, Developments in the Law— Defamation, 69 Harv. L. Rev. 875, 891–892 (1956). As a result, courts for centuries have allowed juries to presume that some damage occurred from many defamatory utter-

---

credit"—the case before us today—"If the first amendment requirements outlined in *Gertz* apply, there is something clearly wrong with the first amendment or with *Gertz.*" Shiffrin, The First Amendment and Economic Regulation: Away From a General Theory of the First Amendment, 78 Nw. U. L. Rev. 1212, 1268 (1983).

ances and publications. Restatement of Torts § 568, Comment *b*, p. 162 (1938) (noting that Hale announced that damages were to be presumed for libel as early as 1670). This rule furthers the state interest in providing remedies for defamation by ensuring that those remedies are effective. In light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages—even absent a showing of "actual malice."[7]

## V

The only remaining issue is whether petitioner's credit report involved a matter of public concern. In a related context, we have held that "[w]hether . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record." *Connick* v. *Myers, supra,* at 147–148.

---

[7]The dissent, purporting to apply the same balancing test that we do today, concludes that even speech on purely private matters is entitled to the protections of *Gertz. Post,* at 786. Its "balance," however, rests on a misinterpretation. In particular, the dissent finds language in *Gertz* that, it believes, shows the State's interest to be "irrelevant." See *post,* at 794. It is then an easy step for the dissent to say that the State's interest is outweighed by even the reduced First Amendment interest in private speech. *Gertz,* however, did not say that the state interest was "irrelevant" in absolute terms. Indeed, such a statement is belied by *Gertz* itself, for it held that presumed and punitive damages were available under some circumstances. 418 U. S., at 349. Rather, what the *Gertz* language indicates is that the State's interest is not substantial relative to the First Amendment interest in *public speech.* This language is thus irrelevant to today's decision.

The dissent's "balance," moreover, would lead to the protection of all libels—no matter how attenuated their constitutional interest. If the dissent were the law, a woman of impeccable character who was branded a "whore" by a jealous neighbor would have no effective recourse unless she could prove "actual malice" by clear and convincing evidence. This is not malice in the ordinary sense, but in the more demanding sense of *New York Times.* The dissent would, in effect, constitutionalize the entire common law of libel.

These factors indicate that petitioner's credit report concerns no public issue.[8] It was speech solely in the individual interest of the speaker and its specific business audience. Cf. *Central Hudson Gas & Elec. Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 561 (1980). This particular interest warrants no special protection when—as in this case—the speech is wholly false and clearly damaging to the victim's business reputation. Cf. *id.*, at 566; *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771–772 (1976). Moreover, since the credit report was made available to only five subscribers, who, under the terms of the subscription agreement, could not disseminate it further, it cannot be said that the report involves any "strong interest in the free flow of commercial information." *Id.*, at 764. There is simply no credible argument that this type of credit reporting requires special protection to ensure that "debate on public issues [will] be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U. S., at 270.

In addition, the speech here, like advertising, is hardy and unlikely to be deterred by incidental state regulation. See *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S., at 771–772. It is solely motivated by the desire for profit, which, we have noted, is a force less likely to be deterred than others. *Ibid.* Arguably, the reporting here was also more objectively verifiable than speech deserving of greater protection. See *ibid.* In any case, the market provides a powerful incentive to a credit reporting

---

[8] The dissent suggests that our holding today leaves all credit reporting subject to reduced First Amendment protection. This is incorrect. The protection to be accorded a particular credit report depends on whether the report's "content, form, and context" indicate that it concerns a public matter. We also do not hold, as the dissent suggests we do, *post*, at 787, that the report is subject to reduced constitutional protection because it constitutes economic or commercial speech. We discuss such speech, along with advertising, only to show how many of the same concerns that argue in favor of reduced constitutional protection in those areas apply here as well.

agency to be accurate, since false credit reporting is of no use to creditors. Thus, any incremental "chilling" effect of libel suits would be of decreased significance.[9]

## VI

We conclude that permitting recovery of presumed and punitive damages in defamation cases absent a showing of "actual malice" does not violate the First Amendment when the defamatory statements do not involve matters of public concern. Accordingly, we affirm the judgment of the Vermont Supreme Court.

*It is so ordered.*

CHIEF JUSTICE BURGER, concurring in the judgment.

In *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), contrary to well-established common law prevailing in the states, a divided Court held that a private plaintiff in a defamation action cannot recover for a published falsehood unless he proves that the defendant was at least negligent in publishing the falsehood. The Court further held that there can be no "presumed" damages in such an action and that the private plaintiff cannot receive "punitive" damages unless it is established that the publication was made with "actual malice," as defined in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964).

I dissented in *Gertz* because I believed that, insofar as the "ordinary private citizen" was concerned, 418 U. S., at 355, the Court's opinion "abandon[ed] the traditional thread," *id.,* at 354–355, that had been the theme of the law in this country

---

[9] The Court of Appeals for the Fifth Circuit has noted that, while most States provide a qualified privilege against libel suits for commercial credit reporting agencies, in those States that do not there is a thriving credit reporting business and commercial credit transactions are not inhibited. *Hood* v. *Dun & Bradstreet, Inc.,* 486 F. 2d 25, 32 (1973), cert. denied, 415 U. S. 985 (1974). The court cited an empirical study comparing credit transactions in Boise, Idaho, where there is no privilege, with those in Spokane, Washington, where there is one. 486 F. 2d, at 32, and n. 18.

up to that time. I preferred "to allow this area of law to continue to evolve as it [had] up to [then] with respect to private citizens rather than embark on a new doctrinal theory which [had] no jurisprudential ancestry." *Ibid.* *Gertz*, however, is now the law of the land, and until it is overruled, it must, under the principle of *stare decisis*, be applied by this Court.

The single question before the Court today is whether *Gertz* applies to this case. The plurality opinion holds that *Gertz* does not apply because, unlike the challenged expression in *Gertz*, the alleged defamatory expression in this case does not relate to a matter of public concern. I agree that *Gertz* is limited to circumstances in which the alleged defamatory expression concerns a matter of general public importance, and that the expression in question here relates to a matter of essentially private concern. I therefore agree with the plurality opinion to the extent that it holds that *Gertz* is inapplicable in this case for the two reasons indicated. No more is needed to dispose of the present case.

I continue to believe, however, that *Gertz* was ill-conceived, and therefore agree with JUSTICE WHITE that *Gertz* should be overruled. I also agree generally with JUSTICE WHITE's observations concerning *New York Times Co. v. Sullivan*. *New York Times*, however, equates "reckless disregard of the truth" with malice; this should permit a jury instruction that malice may be found if the defendant is shown to have published defamatory material which, in the exercise of reasonable care, would have been revealed as untrue. But since the Court has not applied the literal language of *New York Times* in this way, I agree with JUSTICE WHITE that it should be reexamined. The great rights guaranteed by the First Amendment carry with them certain responsibilities as well.

Consideration of these issues inevitably recalls an aphorism of journalism that "too much checking on the facts has ruined many a good news story."

JUSTICE WHITE, concurring in the judgment.

Until *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), the law of defamation was almost exclusively the business of state courts and legislatures. Under the then prevailing state libel law, the defamed individual had only to prove a false written publication that subjected him to hatred, contempt, or ridicule. Truth was a defense; but given a defamatory false circulation, general injury to reputation was presumed; special damages, such as pecuniary loss and emotional distress, could be recovered; and punitive damages were available if common-law malice were shown. General damages for injury to reputation were presumed and awarded because the judgment of history was that "in many cases the effect of defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed." Restatement of Torts § 621, Comment *a*, p. 314 (1938). The defendant was permitted to show that there was no reputational injury; but at the very least, the prevailing rule was that at least nominal damages were to be awarded for any defamatory publication actionable *per se*. This rule performed

> "a vindicatory function by enabling the plaintiff publicly to brand the defamatory publication as false. The salutary social value of this rule is preventive in character since it often permits a defamed person to expose the groundless character of a defamatory rumor before harm to the reputation has resulted therefrom." *Id.* § 569, Comment *b*, p. 166.

Similar rules applied to slanderous statements that were actionable *per se.*[1]

---

[1] At the common law, slander, unlike libel, was actionable *per se* only when it dealt with a narrow range of statements: those imputing a criminal offense, a venereal or loathsome and communicable disease, improper conduct of a lawful business, or unchastity of a woman. Restatement of Torts

*New York Times Co.* v. *Sullivan* was the first major step in what proved to be a seemingly irreversible process of constitutionalizing the entire law of libel and slander. Under the rule announced in that case, a public official suing for libel could no longer make out his case by proving a false and damaging publication. He could not establish liability and recover any damages, whether presumed or actually proved, unless he proved "malice," which was defined as a knowing falsehood or a reckless disregard for the truth. 376 U. S., at 280. Given that proof, however, the usual damages were available, including presumed and punitive damages. This judgment overturning 200 years of libel law was deemed necessary to implement the First Amendment interest in "uninhibited, robust, and wide-open" debate on public issues. *Id.*, at 270. Three years later, the same rule was applied to plaintiffs who were not public officials, but who were termed public figures. *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 155 (1967).

In 1971, four Justices took the view that the *New York Times* rules should apply wherever a publication concerned any manner of general or public interest, even though the plaintiff was a private person. *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29. That view did not command a majority. But in *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), the Court again dealt with defamation actions by private individuals, for the first time holding that such plaintiffs could no longer recover by proving a false statement, no matter how damaging it might be to reputation. They must, in addition, prove some "fault," at least negligence. *Id.*, at 347, 350. Even with that proof, damages were not presumed but had to be proved. *Id.*, at 349. Furthermore, no punitive damages were available without proof of *New York Times* malice.

---

§ 570 (1938). To be actionable, all other slanderous statements required additional proof of special damages other than an injury to reputation or emotional distress. The special damages most often took the form of material or pecuniary loss. *Id.* § 575 and Comment *b*, pp. 185–187.

418 U. S., at 350. This decision, which again purported to implement First Amendment values, seemingly left no defamation actions free from federal constitutional limitations.

I joined the judgment and opinion in *New York Times*. I also joined later decisions extending the *New York Times* standard to other situations. But I came to have increasing doubts about the soundness of the Court's approach and about some of the assumptions underlying it. I could not join the plurality opinion in *Rosenbloom*, and I dissented in *Gertz*, asserting that the common-law remedies should be retained for private plaintiffs. I remain convinced that *Gertz* was erroneously decided. I have also become convinced that the Court struck an improvident balance in the *New York Times* case between the public's interest in being fully informed about public officials and public affairs and the competing interest of those who have been defamed in vindicating their reputation.

In a country like ours, where the people purport to be able to govern themselves through their elected representatives, adequate information about their government is of transcendent importance. That flow of intelligence deserves full First Amendment protection. Criticism and assessment of the performance of public officials and of government in general are not subject to penalties imposed by law. But these First Amendment values are not at all served by circulating false statements of fact about public officials. On the contrary, erroneous information frustrates these values. They are even more disserved when the statements falsely impugn the honesty of those men and women and hence lessen the confidence in government. As the Court said in *Gertz:* "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." 418 U. S., at 340. Yet in *New York Times* cases, the public official's complaint will be dismissed unless he alleges and makes out a jury case of a knowing or reckless falsehood. Absent such proof, there will be no

jury verdict or judgment of any kind in his favor, even if the challenged publication is admittedly false. The lie will stand, and the public continue to be misinformed about public matters. This will recurringly happen because the putative plaintiff's burden is so exceedingly difficult to satisfy and can be discharged only by expensive litigation. Even if the plaintiff sues, he frequently loses on summary judgment or never gets to the jury because of insufficient proof of malice. If he wins before the jury, verdicts are often overturned by appellate courts for failure to prove malice. Furthermore, when the plaintiff loses, the jury will likely return a general verdict and there will be no judgment that the publication was false, even though it was without foundation in reality.[2] The public is left to conclude that the challenged statement was true after all. Their only chance of being accurately informed is measured by the public official's ability himself to counter the lie, unaided by the courts. That is a decidedly weak reed to depend on for the vindication of First Amend-

---

[2] If the plaintiff succeeds in proving a jury case of malice, it may be that the jury will be asked to bring in separate verdicts on falsity and malice. In that event, there could be a verdict in favor of the plaintiff on falsity, but against him on malice. There would be no judgment in his favor, but the verdict on falsity would be a public one and would tend to set the record right and clear the plaintiff's name.

It might be suggested that courts, as organs of the government, cannot be trusted to discern what the truth is. But the logical consequence of that view is that the First Amendment forbids all libel and slander suits, for in each such suit, there will be no recovery unless the court finds the publication at issue to be factually false. Of course, no forum is perfect, but that is not a justification for leaving whole classes of defamed individuals without redress or a realistic opportunity to clear their names. We entrust to juries and the courts the responsibility of decisions affecting the life and liberty of persons. It is perverse indeed to say that these bodies are incompetent to inquire into the truth of a statement of fact in a defamation case. I can therefore discern nothing in the Constitution which forbids a plaintiff to obtain a judicial decree that a statement is false—a decree he can then use in the community to clear his name and to prevent further damage from a defamation already published.

ment interests—"it is the rare case where the denial overtakes the original charge. Denials, retractions, and corrections are not 'hot' news, and rarely receive the prominence of the original story." *Rosenbloom*, 403 U. S., at 46–47 (opinion of BRENNAN, J.); *Gertz, supra*, at 363–364 (BRENNAN, J., dissenting).

Also, by leaving the lie uncorrected, the *New York Times* rule plainly leaves the public official without a remedy for the damage to his reputation. Yet the Court has observed that the individual's right to the protection of his own good name . is a basic consideration of our constitutional system, reflecting "'our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'" *Gertz, supra*, at 341, quoting *Rosenblatt* v. *Baer*, 383 U. S. 75, 92 (1966) (Stewart, J., concurring). The upshot is that the public official must suffer the injury, often cannot get a judgment identifying the lie for what it is, and has very little, if any, chance of countering that lie in the public press.

The *New York Times* rule thus countenances two evils: first, the stream of information about public officials and public affairs is polluted and often remains polluted by false information; and second, the reputation and professional life of the defeated plaintiff may be destroyed by falsehoods that might have been avoided with a reasonable effort to investigate the facts. In terms of the First Amendment and reputational interests at stake, these seem grossly perverse results.

Of course, the Court in *New York Times* could not have been unaware of these realities. Despite our ringing endorsement of "wide-open" and "uninhibited" debate, which taken literally would protect falsehoods of all kinds, we cannot fairly be accused of giving constitutional protection to false information as such, for we went on to find competing and overriding constitutional justification for our decision. The constitutional interest in the flow of information about

public affairs was thought to be very strong, and discovering the truth in this area very difficult, even with the best of efforts. These considerations weighed so heavily that those who write and speak about public affairs were thought to require some breathing room—that is, they should be permitted to err and misinform the public as long as they act unknowingly and without recklessness. If the press could be faced with possibly sizable damages for every mistaken publication injurious to reputation, the result would be an unacceptable degree of self-censorship, which might prevent the occasional mistaken libel, but would also often prevent the timely flow of information that is thought to be true but cannot be readily verified. The press must therefore be privileged to spread false information, even though that information has negative First Amendment value and is severely damaging to reputation, in order to encourage the full flow of the truth, which otherwise might be withheld.

*Gertz* is subject to similar observations. Although rejecting the *New York Times* malice standard where the plaintiff is neither a public official nor a public figure, there the Court nevertheless deprived the private plaintiff of his common-law remedies, making recovery more difficult in order to provide a margin for error. In doing so, the Court ruled that without proof of at least negligence, a plaintiff damaged by the most outrageous falsehoods would be remediless, and the lie very likely would go uncorrected. And even if fault were proved, actual damage to reputation would have to be shown, a burden traditional libel law considered difficult, if not impossible, to discharge. For this reason JUSTICE POWELL would not impose on the plaintiff the burden of proving damages in the case now before us.

Although there was much talk in *Gertz* about liability without fault and the unfairness of presuming damages, all of this, as was the case in *New York Times*, was done in the name of the First Amendment, purportedly to shield the press and others writing about public affairs from possibly intimidating

damages liability. But if protecting the press from intimidating damages liability that might lead to excessive timidity was the driving force behind *New York Times* and *Gertz*, it is evident that the Court engaged in severe overkill in both cases.

In *New York Times*, instead of escalating the plaintiff's burden of proof to an almost impossible level, we could have achieved our stated goal by limiting the recoverable damages to a level that would not unduly threaten the press. Punitive damages might have been scrutinized as Justice Harlan suggested in *Rosenbloom, supra*, at 77, or perhaps even entirely forbidden. Presumed damages to reputation might have been prohibited, or limited, as in *Gertz*. Had that course been taken and the common-law standard of liability been retained, the defamed public official, upon proving falsity, could at least have had a judgment to that effect. His reputation would then be vindicated; and to the extent possible, the misinformation circulated would have been countered. He might have also recovered a modest amount, enough perhaps to pay his litigation expenses. At the very least, the public official should not have been required to satisfy the actual malice standard where he sought no damages but only to clear his name. In this way, both First Amendment and reputational interests would have been far better served.

We are not talking in these cases about mere criticism or opinion, but about misstatements of fact that seriously harm the reputation of another, by lowering him in the estimation of the community or to deter third persons from associating or dealing with him. Restatement of Torts § 559 (1938). The necessary breathing room for speakers can be ensured by limitations on recoverable damages; it does not also require depriving many public figures of any room to vindicate their reputations sullied by false statements of fact. It could be suggested that even without the threat of large presumed and punitive damages awards, press defendants' communica-

tion will be unduly chilled by having to pay for the actual damages caused to those they defame. But other commercial enterprises in this country not in the business of disseminating information must pay for the damage they cause as a cost of doing business, and it is difficult to argue that the United States did not have a free and vigorous press before the rule in *New York Times* was announced. In any event, the *New York Times* standard was formulated to protect the press from the chilling danger of numerous large damages awards. Nothing in the central rationale behind *New York Times* demands an absolute immunity from suits to establish the falsity of a defamatory misstatement about a public figure where the plaintiff cannot make out a jury case of actual malice.

I still believe the common-law rules should have been retained where the plaintiff is not a public official or public figure. As I see it, the Court undervalued the reputational interest at stake in such cases. I have also come to doubt the easy assumption that the common-law rules would muzzle the press. But even accepting the *Gertz* premise that the press also needed protection in suits by private parties, there was no need to modify the common-law requirements for establishing liability and to increase the burden of proof that must be satisfied to secure a judgment authorizing at least nominal damages and the recovery of additional sums within the limitations that the Court might have set.[3]

It is interesting that JUSTICE POWELL declines to follow the *Gertz* approach in this case. I had thought that the decision in *Gertz* was intended to reach cases that involve any false statements of fact injurious to reputation, whether the statement is made privately or publicly and whether or not it implicates a matter of public importance. JUSTICE POWELL, however, distinguishes *Gertz* as a case that involved a matter

---

[3] The Court was unresponsive to my suggestion in dissent, 418 U. S., at 391–392, that the plaintiff should be able to prove and obtain a judgment of falsehood without having to establish any kind of fault.

of public concern, an element absent here. Wisely, in my view, JUSTICE POWELL does not rest his application of a different rule here on a distinction drawn between media and nonmedia defendants. On that issue, I agree with JUSTICE BRENNAN that the First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech. None of our cases affords such a distinction; to the contrary, the Court has rejected it at every turn.[4] It should be rejected again, particularly in this context, since it makes no sense to give the most protection to those publishers who reach the most readers and therefore pollute the channels of communication with the most misinformation and do the most damage to private reputation. If *Gertz* is to be distinguished from this case, on the ground that it applies only where the allegedly false publication deals with a matter of general or public importance, then where the false publication does not deal with such a matter, the common-law rules would apply whether the defendant is a member of the media or other public disseminator or a nonmedia individual publishing privately. Although JUSTICE POWELL speaks only of the inapplicability of the *Gertz* rule with respect to presumed and

---

[4] We explained in *Branzburg* v. *Hayes*, 408 U. S. 665 (1972) that "the informative function asserted by representatives of the organized press" to justify greater privileges under the First Amendment was also "performed by lecturers, political pollsters, novelists, academic researchers, and dramatists." *Id.*, at 705. From its inception, without discussing the issue, we have applied the rule of *New York Times* to nonmedia defendants. See *New York Times*, 376 U. S., at 254, n., 286; *Henry* v. *Collins*, 380 U. S. 356 (1965); *Garrison* v. *Louisiana*, 379 U. S. 64 (1964). And this Court has made plain that the organized press has a monopoly neither on the First Amendment nor on the ability to enlighten. *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 782 (1978). See also *Pell* v. *Procunier*, 417 U. S. 817 (1974) (press has no independent First Amendment right of access to prisons). Cf. *Buckley* v. *Valeo*, 424 U. S. 1, 48–49 (1976) (the idea that government can restrict the speech of some elements of society to enhance the relative voice of others is "wholly foreign" to the First Amendment).

punitive damages, it must be that the *Gertz* requirement of some kind of fault on the part of the defendant is also inapplicable in cases such as this.

As I have said, I dissented in *Gertz,* and I doubt that the decision in that case has made any measurable contribution to First Amendment or reputational values since its announcement. Nor am I sure that it has saved the press a great deal of money. Like the *New York Times* decision, the burden that plaintiffs must meet invites long and complicated discovery involving detailed investigation of the workings of the press, how a news story is developed, and the state of mind of the reporter and publisher. See *Herbert* v. *Lando,* 441 U. S. 153 (1979). That kind of litigation is very expensive. I suspect that the press would be no worse off financially if the common-law rules were to apply and if the judiciary was careful to insist that damages awards be kept within bounds. A legislative solution to the damages problem would also be appropriate. Moreover, since libel plaintiffs are very likely more interested in clearing their names than in damages, I doubt that limiting recoveries would deter or be unfair to them. In any event, I cannot assume that the press, as successful and powerful as it is, will be intimidated into withholding news that by decent journalistic standards it believes to be true.

The question before us is whether *Gertz* is to be applied in this case. For either of two reasons, I believe that it should not. First, I am unreconciled to the *Gertz* holding and believe that it should be overruled. Second, as JUSTICE POWELL indicates, the defamatory publication in this case does not deal with a matter of public importance. Consequently, I concur in the Court's judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

This case involves a difficult question of the proper application of *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974), to credit reporting—a type of speech at some remove from that

which first gave rise to explicit First Amendment restrictions on state defamation law—and has produced a diversity of considered opinions, none of which speaks for the Court. JUSTICE POWELL's plurality opinion affirming the judgment below would not apply the *Gertz* limitations on presumed and punitive damages to this case; rather, the three Justices joining that opinion would hold that the First Amendment requirement of actual malice—a clear and convincing showing of knowing falsehood or reckless disregard for the truth— should have no application in this defamation action because the speech involved a subject of purely private concern and was circulated to an extremely limited audience. Establishing this exception, the opinion reaffirms *Gertz* for cases involving matters of public concern, *ante*, at 756–757, and reaffirms *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), for cases in which the challenged speech allegedly libels a public official or a public figure. *Ante*, at 755. JUSTICE WHITE also would affirm; he would not apply *Gertz* to this case on the ground that the subject matter of the publication does not deal with a matter of general or public importance. *Ante*, at 774 (concurring in judgment).[1] THE CHIEF JUSTICE apparently agrees with JUSTICE WHITE. *Ante*, at 764 (concurring in judgment). The four who join this opinion would reverse the judgment of the Vermont Supreme Court. We believe that, although protection of the type of expression at issue is admittedly not the "central meaning of the First Amendment," 376 U. S., at 273, *Gertz* makes clear that the First Amendment nonetheless requires restraints on presumed and punitive damages awards for this

---

[1] JUSTICE WHITE also ventures some modest proposals for restructuring the First Amendment protections currently afforded defendants in defamation actions. JUSTICE WHITE agrees with *New York Times Co.* v. *Sullivan*, however, that the breathing space needed to ensure the robust debate of public issues essential to our democratic society is impermissibly threatened by unrestrained damages awards for defamatory remarks. *Ante*, at 770–772 (opinion concurring in judgment).

expression. The lack of consensus in approach to these idiosyncratic facts should not, however, obscure the solid allegiance the principles of *New York Times Co.* v. *Sullivan* continue to command in the jurisprudence of this Court. See also *Bose Corp.* v. *Consumer's Union of the United States, Inc.*, 466 U. S. 485 (1984).

I

In *New York Times Co.* v. *Sullivan* the Court held that the First Amendment shields all who speak in good faith from the threat of unrestrained libel judgments for unintentionally false criticism of a public official. Recognizing that libel law, like all other governmental regulation of the content of speech, "can claim no talismanic immunity from constitutional limitations [and] must be measured by standards that satisfy the First Amendment," 376 U. S., at 269, the Court drew from salutary common-law developments, *id.*, at 280, and n. 20,[2] and unquestioned First Amendment principles, *id.*, at 273–274, to formulate the now-familiar actual malice test. Because the "erroneous statement is inevitable in free debate . . . [it] must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *New York Times Co.* v. *Sullivan, supra,* at

---

[2] The principles were expressed as early as 1788 in an opinion of the Pennsylvania Supreme Court:

"What then is the meaning of *the bill of rights*, and *Constitution* of *Pennsylvania*, when they declare, 'That the freedom of the press shall not be restrained,' and 'that the printing presses shall be free to every person who undertakes to examine the proceedings of the legislature or any part of the government?' . . . [T]hey give to every citizen a right of investigating the conduct of those who are entrusted with the public business . . . . The true liberty of the press is amply secured by permitting every man to publish his opinions; but it is due to the peace and dignity of society to enquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame. To the latter description, it is impossible that any good government should afford protection and impunity." *Respublica* v. *Oswald*, 1 Dall. 319, 325 (footnotes omitted).

271–272, quoting *NAACP* v. *Button*, 371 U. S. 415, 433 (1963); see *Bose Corp., supra*, at 513. These solidly accepted principles are not at issue today.

Our First Amendment libel decisions in the last two decades have in large measure been an effort to explore the full ramifications of the *New York Times Co.* v. *Sullivan* principles. Building on the extension of actual malice to "public figure" plaintiffs in *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967), the Court in *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971), and *Gertz* v. *Robert Welch, Inc., supra*, focused largely on defining the circumstances under which protection of the central First Amendment value of robust debate of *public issues* should mandate plaintiffs to show actual malice to obtain a judgment and actual damages; the Court settled on a rule requiring actual malice as a prerequisite to recovery only in suits brought by public officials or public figures. 418 U. S., at 344–346.[3] We have also recognized, however, that the First Amendment requires significant protection from defamation law's chill for a range of expression far broader than simply speech about pure political issues. See *Time, Inc.* v. *Hill*, 385 U. S. 374, 388 (1967) ("The guarantees for free speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government"); cf. *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 231 (1977).

---

[3] A plurality in *Rosenbloom* would have applied the actual malice standard of liability when the alleged libel concerned matters of "public or general interest," irrespective of the status of the plaintiff. 403 U. S., at 43 (opinion of BRENNAN, J.). In *Gertz* the Court rejected the *Rosenbloom* plurality's "public or general interest" approach. That approach was thought unacceptably to impair the reputational interests of private individuals, who, unlike public officials or public figures, neither assume the risk of rough treatment by entering the public arena nor have ready access to the media to rebut false charges. 418 U. S., at 344–345. It was also thought to "occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest.'" *Id.*, at 346 (citation omitted).

Our cases since *New York Times Co.* v. *Sullivan* have proceeded from the general premise that all libel law implicates First Amendment values to the extent it deters true speech that would otherwise be protected by the First Amendment. 376 U. S., at 269. In this sense defamation law does not differ from state efforts to control obscenity, see *Miller* v. *California*, 413 U. S. 15, 23–24 (1973), ensure loyalty, see *Speiser* v. *Randall*, 357 U. S. 513 (1958), protect consumers, see *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), oversee professions, see *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985), or pursue other public welfare goals through content-based regulation of speech. "When we deal with the complex of strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in the light of the particular circumstances to which it is applied." *Speiser* v. *Randall, supra*, at 520. This general proscription against unnecessarily broad content-based regulation permeates First Amendment jurisprudence.

In libel law, no less than any other governmental effort to regulate speech, States must therefore use finer instruments to ensure adequate space for protected expression. Cf. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 565 (1980) (restriction "may extend only so far as the interest it serves"); *Lowe* v. *SEC*, *ante*, at 234 (WHITE, J., concurring in judgment) ("[T]he First Amendment permits restraints on speech only when they are narrowly tailored to advance a legitimate governmental interest"). The ready availability and unconstrained application of presumed and punitive damages in libel actions is too blunt a regulatory instrument to satisfy this First Amendment principle, even when the alleged libel does not implicate directly the type of speech at issue in *New York Times Co.* v.

*Sullivan.* Justice Harlan made precisely this point in *Rosenbloom:*

> "At a minimum, *even in the purely private libel area,* I think the First Amendment should be construed to limit the imposition of punitive damages to those situations where actual malice is proved. This is the typical standard employed in assessing anyone's liability for punitive damages where the underlying aim of the law is to compensate for harm actually caused, . . . and no conceivable state interest could justify imposing a harsher standard on the exercise of *those freedoms that are given explicit protection by the First Amendment.*" 403 U. S., at 73 (dissenting opinion) (emphasis added).

See also *id.,* at 65; *New York Times Co.* v. *Sullivan,* 376 U. S., at 269.

Justice Harlan's perception formed the cornerstone of the Court's analysis in *Gertz.* Requiring "that state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved," the Court found it "necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury." 418 U. S., at 349. The Court explained that state rules authorizing presumed and punitive damages conferred on juries "largely uncontrolled discretion" to assess damages "in wholly unpredictable amounts bearing no necessary relation to the actual harm caused." *Id.,* at 349–350. Punitive damages in particular were found to be *"wholly irrelevant* to the state interest" because "[t]hey are not compensation for injury." *Id.,* at 350 (emphasis added). For these reasons, the Court in *Gertz* specifically held that the award of presumed and punitive damages on less than a showing of actual malice is not a narrowly tailored means to achieve the legitimate state purpose of protecting the reputation of private persons: the common-law approach, said the Court, *"unnecessarily* compounds the

potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms." *Id.*, at 349 (emphasis added).[4]

Thus, when an alleged libel involves criticism of a public official or a public figure, the need to nurture robust debate of public issues and the requirement that all state regulation of speech be narrowly tailored coalesce to require actual malice as a prerequisite to any recovery. When the alleged libel involves speech that falls outside these especially important categories, we have held that the Constitution permits States significant leeway to compensate for actual damage to reputation.[5] The requirement of narrowly tailored

---

[4] Since the decision in *Gertz*, we have applied its reasoning with respect to damages in excess of compensation for actual harm in other areas of the law. See, *e. g., Electrical Workers* v. *Foust*, 442 U. S. 42, 48–52 (1979); *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 270–271 (1981). These cases, like *Gertz*, recognize that "the alleged deterrence achieved by punitive damages awards is likely outweighed by the costs—such as the encouragement of unnecessary litigation and the chilling of desirable conduct—flowing from the rule, at least when the standards on which the awards are based are ill-defined." *Smith* v. *Wade*, 461 U. S. 30, 59 (1983) (REHNQUIST, J., dissenting). See *id.*, at 46–47 (Court opinion) (noting prevailing view that punitive damages may only be awarded for "'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others,'" quoting Restatement (Second) of Torts § 908(2) (1979) (emphasis deleted)); 461 U. S., at 93–94 (O'CONNOR, J., dissenting); *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 244–245 (1984); *id.*, at 260–261 (BLACKMUN, J., dissenting); *id.*, at 276 (POWELL, J., dissenting).

[5] Such speech might at times involve issues of public or general interest within the meaning of *Rosenbloom* and thus implicate important First Amendment interests. To justify this cost, the Court in *Gertz* held that the State had an enhanced interest in protecting private reputation and cited the independent First Amendment difficulties inherent in case-by-case judicial determination of whether speech concerns a matter of public interest. 418 U. S., at 344–346. See n. 3, *supra*. The decision in *Gertz* is also susceptible of an alternative justification. Speech allegedly defaming a private person will generally be far less likely to implicate matters of public importance than will speech allegedly defaming public officials or public figures. In light of the problems inherent in case-by-case judicial

regulatory measures, however, always mandates at least a showing of fault and proscribes the award of presumed and punitive damages on less than a showing of actual malice. It has remained the judgment of the Court since *Gertz* that this comprehensive two-tiered structure best accommodates the values of the constitutional free speech guarantee and the States' interest in protecting reputation.

## II

The question presented here is narrow. Neither the parties nor the courts below have suggested that respondent Greenmoss Builders should be required to show actual malice to obtain a judgment and actual compensatory damages. Nor do the parties question the requirement of *Gertz* that respondent must show fault to obtain a judgment and actual damages. The only question presented is whether a jury award of presumed and punitive damages based on less than a showing of actual malice is constitutionally permissible. *Gertz* provides a forthright negative answer. To preserve the jury verdict in this case, therefore, the opinions of JUSTICE POWELL and JUSTICE WHITE have cut away the protective mantle of *Gertz*.

## A

Relying on the analysis of the Vermont Supreme Court, respondent urged that this pruning be accomplished by restricting the applicability of *Gertz* to cases in which the defendant is a "media" entity. Such a distinction is irreconcilable with the fundamental First Amendment principle that "[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." *First National Bank of Boston* v. *Bellotti*, 435

---

determination of what is in the public interest, the Court's result could be explained as a decision that the cost of case-by-case evaluation could be avoided without significant chilling of speech involving matters of public importance.

U. S. 765, 777 (1978).   First Amendment difficulties lurk in the definitional questions such an approach would generate.[6] And the distinction would likely be born an anachronism.[7]

---

[6] An attempt to characterize petitioner Dun & Bradstreet illustrates the point.   Like an account of judicial proceedings in a newspaper, magazine, or news broadcast, a statement in petitioner's reports that a particular company has filed for bankruptcy is a report of a timely news event conveyed to members of the public by a business organized to collect and disseminate such information.   Thus it is not obvious why petitioner should find less protection in the First Amendment than do established print or electronic media.   The Vermont Supreme Court nonetheless characterized petitioner as a nonmedia defendant entitled to less protection because it is "in the business of selling financial information to a limited number of subscribers who have paid substantial fees for [its] services."   143 Vt. 66, 73, 461 A. 2d 414, 417 (1983).   The court added that "[t]here is a clear distinction between a publication which disseminates news for public consumption and one which provides specialized information to a selective, finite audience."   *Ibid.*

No clear line consistent with First Amendment principles can be drawn on the basis of these criteria.   That petitioner's information is "specialized" or that its subscribers pay "substantial fees" hardly distinguishes these reports from articles in many publications that would surely fall on the "media" side of the line the Vermont Supreme Court seeks to draw. Few published statements are of universal interest, and few publications are distributed without charge.   Much fare of any metropolitan daily is specialized information for which a selective, finite audience pays a fee. Nor is there any reason to treat petitioner differently than a more widely circulated publication because it has "a limited number of subscribers." Indeed, it would be paradoxical to increase protection to statements injurious to reputation as the size of their audience, and hence their potential to injure, grows.   Cf. *Keeton* v. *Hustler Magazine, Inc.,* 465 U. S. 770, 781 (1984).

[7] Owing to transformations in the technological and economic structure of the communications industry, there has been an increasing convergence of what might be labeled "media" and "nonmedia."   Pool, The New Technologies: Promise of Abundant Channels at Lower Cost, in What's News: The Media in American Society 81, 87 (1981).   See also I. Pool, Technologies of Freedom (1983); U. S. Federal Trade Commission, Media Policy Session: Technology and Legal Change (1979); Subcommittee on Telecommunications, Consumer Protection, and Finance of the House Committee on Energy and Commerce, Telecommunications in Transition: The Status

Perhaps most importantly, the argument that *Gertz* should be limited to the media misapprehends our cases. We protect the press to ensure the vitality of First Amendment guarantees.[8] This solicitude implies no endorsement of the principle that speakers other than the press deserve lesser First Amendment protection. "In the realm of protected speech, the legislature is constitutionally disqualified from dictating . . . the speakers who may address a public issue." *First National Bank of Boston* v. *Bellotti, supra,* at 784–785. See *Bridges* v. *California,* 314 U. S. 252, 277–278 (1941).

The free speech guarantee gives each citizen an equal right to self-expression and to participation in self-government. See, *e. g., Carey* v. *Brown,* 447 U. S. 455, 459–463 (1980); *Police Department of Chicago* v. *Mosley,* 408 U. S. 92 (1972); *Cohen* v. *California,* 403 U. S. 15, 24 (1971); *Whitney* v. *California,* 274 U. S. 357, 375–377 (1927) (Brandeis, J., concurring). This guarantee also protects the rights of listeners to "the widest possible dissemination of information from diverse and antagonistic sources." *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945).[9] Accordingly, at least six

---

of Competition in the Telecommunications Industry, 97th Cong., 1st Sess. (Comm. Print 1981).

[8] See, *e. g., Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue,* 460 U. S. 575, 585 (1983); *Columbia Broadcasting System, Inc.* v. *FCC,* 453 U. S. 367, 395 (1981); *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974); *Branzburg* v. *Hayes,* 408 U. S. 665, 707 (1972); *New York Times Co.* v. *United States,* 403 U. S. 713 (1971); *Mills* v. *Alabama,* 384 U. S. 214, 218–219 (1966); *Grosjean* v. *American Press Co., Inc.,* 297 U. S. 233, 250 (1936). See also *Herbert* v. *Lando,* 441 U. S. 153, 180–199 (1979) (BRENNAN, J., dissenting in part); *Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 850 (1974) (POWELL, J., dissenting); *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376, 393 (1973) (BURGER, C. J., dissenting); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969); *Time, Inc.* v. *Hill,* 385 U. S. 374, 389 (1967); Stewart, "Or of the Press," 26 Hastings L. J. 631 (1975).

[9] In light of the "increasingly prominent role of mass media in our society, and the awesome power it has placed in the hands of a select few," *Gertz,* 418 U. S., at 402 (WHITE, J., dissenting), protection for the speech

Members of this Court (the four who join this opinion and JUSTICE WHITE and THE CHIEF JUSTICE) agree today that, in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities. See *ante*, at 773 (opinion concurring in judgment).[10]

## B

Eschewing the media/nonmedia distinction, the opinions of both JUSTICE WHITE and JUSTICE POWELL focus primarily on the content of the credit report as a reason for restricting the applicability of *Gertz*. Arguing that at most *Gertz* should protect speech that "deals with a matter of public or general importance," *ante*, at 773, JUSTICE WHITE, without analysis or explanation, decides that the credit report at issue here falls outside this protected category. The plurality opinion of JUSTICE POWELL offers virtually the same conclusion with at least a garnish of substantive analysis.

Purporting to "employ the approach approved in *Gertz*," *ante*, at 757, JUSTICE POWELL balances the state interest in protecting private reputation against the First Amendment interest in protecting expression on matters not of public concern. The state interest is found to be identical to that at stake in *Gertz*. The First Amendment interest is, however, found to be significantly weaker because speech on public issues, such as that involved in *Gertz*, receives greater constitutional protection than speech that is not a matter of public concern. See *ante*, at 759–760, citing *Connick* v. *Myers*,

---

of nonmedia defendants is essential to ensure a diversity of perspectives. See J. Barron, Freedom of the Press for Whom? (1973). "[U]ninhibited, robust and wide-open" debate, *New York Times Co.* v. *Sullivan*, 376 U. S., at 270, among nonmedia speakers is as essential to the fostering and development of an individual's political thought as is such debate in the mass media. See J. Klapper, The Effects of Mass Communications (1960).

[10] JUSTICE POWELL's opinion does not expressly reject the media/ nonmedia distinction, but does expressly decline to apply that distinction to resolve this case.

461 U. S. 138 (1983). JUSTICE POWELL is willing to concede that such speech receives some First Amendment protection, but on balance finds that such protection does not reach so far as to restrain the state interest in protecting reputation through presumed and punitive damages awards in state defamation actions. *Ante*, at 760–761. Without explaining what *is* a "matter of public concern," the plurality opinion proceeds to serve up a smorgasbord of reasons why the speech at issue here is not, *ante*, at 761–762, and on this basis affirms the Vermont courts' award of presumed and punitive damages.

In professing allegiance to *Gertz*, the plurality opinion protests too much. As JUSTICE WHITE correctly observes, JUSTICE POWELL departs completely from the analytic framework and result of that case: "*Gertz* was intended to reach cases that involve any false statements . . . whether or not [they] implicat[e] a matter of public importance." *Ante*, at 772 (concurring in judgment).[11] Even accepting the notion that a distinction can and should be drawn between matters

---

[11] One searches *Gertz* in vain for a single word to support the proposition that limits on presumed and punitive damages obtained only when speech involved matters of public concern. *Gertz* could not have been grounded in such a premise. Distrust of placing in the courts the power to decide what speech was of public concern was precisely the rationale *Gertz* offered for rejecting the *Rosenbloom* plurality approach. 418 U. S., at 346. It would have been incongruous for the Court to go on to circumscribe the protection against presumed and punitive damages by reference to a judicial judgment as to whether the speech at issue involved matters of public concern. At several points the Court in *Gertz* makes perfectly clear the restrictions of presumed and punitive damages were to apply in all cases. *Id.*, at 346, 349–350.

Indeed, JUSTICE POWELL's opinion today is fairly read as embracing the approach of the *Rosenbloom* plurality to deciding when the Constitution should limit state defamation law. The limits imposed, however, are less stringent than those suggest by the *Rosenbloom* plurality. Under the approach of today's plurality, speech about matters of public or general interest receives only the *Gertz* protections against unrestrained presumed and punitive damages, not the full *New York Times Co.* v. *Sullivan* protections against any recovery absent a showing of actual malice.

of public concern and matters of purely private concern, however, the analyses presented by both JUSTICE POWELL and JUSTICE WHITE fail on their own terms. Both, by virtue of what they hold in this case, propose an impoverished definition of "matters of public concern" that is irreconcilable with First Amendment principles. The credit reporting at issue here surely involves a subject matter of sufficient public concern to require the comprehensive protections of *Gertz*. Were this speech appropriately characterized as a matter of only private concern, moreover, the elimination of the *Gertz* restrictions on presumed and punitive damages would still violate basic First Amendment requirements.

### (1)

The five Members of the Court voting to affirm the damages award in this case have provided almost no guidance as to what constitutes a protected "matter of public concern." JUSTICE WHITE offers nothing at all, but his opinion does indicate that the distinction turns on solely the subject matter of the expression and not on the extent or conditions of dissemination of that expression. *Ante*, at 773. JUSTICE POWELL adumbrates a rationale that would appear to focus primarily on subject matter.[12] The opinion relies on the fact that the speech at issue was "solely in the individual interest of the speaker and its specific *business* audience," *ante*, at 762 (emphasis added). Analogizing explicitly to advertising,

---

[12] JUSTICE POWELL also appears to rely in part on the fact that communication was limited and confidential. *Ante*, at 762. Given that his analysis also relies on the subject matter of the credit report, *ante*, at 761–762, it is difficult to decipher exactly what role the nature and extent of dissemination plays in JUSTICE POWELL's analysis. But because the subject matter of the expression at issue is properly understood as a matter of public concern, see *infra*, at 791–793, it may well be that this element of confidentiality is crucial to the outcome as far as JUSTICE POWELL's opinion is concerned. In other words, it may be that JUSTICE POWELL thinks this particular expression could not contribute to public welfare because the public generally does not receive it. This factor does not suffice to save the analysis. See n. 18, *infra*.

the opinion also states that credit reporting is "hardy" and "solely motivated by the desire for profit." *Ibid.* These two strains of analysis suggest that JUSTICE POWELL is excluding the subject matter of credit reports from "matters of public concern" because the speech is predominantly in the realm of matters of economic concern.

In evaluating the subject matter of expression, this Court has consistently rejected the argument that speech is entitled to diminished First Amendment protection simply because it concerns economic matters or is in the economic interest of the speaker or the audience. See, *e. g., Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 501–502 (1952); *American Federation of Labor* v. *Swing,* 312 U. S. 321, 325–326 (1941); *Thornhill* v. *Alabama,* 310 U. S. 88, 101–103 (1940); see also *Abood* v. *Detroit Board of Education,* 431 U. S., at 231–232, and n. 28. "[O]ur cases have never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters—to take a nonexhaustive list of labels—is not entitled to full First Amendment protection." *Id.,* at 231. The breadth of this protection evinces recognition that freedom of expression is not only essential to check tyranny and foster self-government but also intrinsic to individual liberty and dignity and instrumental in society's search for truth. See *Bose Corp.* v. *Consumers Union of United States, Inc.,* 466 U. S., at 503–504; *Whitney* v. *California,* 274 U. S., at 375 (Brandeis, J., concurring).

Speech about commercial or economic matters, even if not directly implicating "the central meaning of the First Amendment," 376 U. S., at 273, is an important part of our public discourse. The Court made clear in the context of discussing labor relations speech in *Thornhill* v. *Alabama, supra:*

> "It is recognized now that satisfactory hours and wages and working conditions in industry and a bargaining position which makes these possible have an importance which is not less than the interests of those in the business or industry directly concerned. The health of the

present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing. The merest glance at state and federal legislation on the subject demonstrates the force of the argument that labor relations are not matters of mere local or private concern. Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society." 310 U. S., at 102–103.

As *Thornhill* suggests, the choices we make when we step into the voting booth may well be the products of what we have learned from the myriad of daily economic and social phenomenon that surround us. See *id.*, at 102 ("Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period").[13]

---

[13] Similarly, we have rejected the arguments for denying or restricting First Amendment protection of advertising on the ground that advertising is not a matter of public concern. Recognizing that even pure advertising may well be affected with a public interest, we have stated that "the free flow of commercial information is indispensable . . . to the formation of intelligent opinions as to how [our economic] system ought to be regulated or altered." *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 765 (1976). See also *Bigelow* v. *Virginia*, 421 U. S. 809, 822 (1975) ("Viewed in its entirety the [abortion] advertisement conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered"). The potential political aspect of attempts to influence consumer preferences has also been recognized. See *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 538–539 (1981) (BRENNAN, J., concurring in judgment) ("May the city decide that a United Automobile Workers billboard with the message 'Be a patriot—do not buy Japanese-manufactured cars' is 'commercial' and therefore forbid it?"). The greater state latitude for regulating commercial

The credit reporting of Dun & Bradstreet falls within any reasonable definition of "public concern" consistent with our precedents. JUSTICE POWELL's reliance on the fact that Dun & Bradstreet publishes credit reports "for profit," *ante*, at 762, is wholly unwarranted. Time and again we have made clear that speech loses none of its constitutional protection "even though it is carried in a form that is 'sold' for profit." *Virginia Pharmacy Bd.*, 425 U. S., at 761. See also *Smith* v. *California*, 361 U. S. 147, 150 (1959); *Joseph Burstyn, Inc.* v. *Wilson, supra,* at 501. More importantly, an announcement of the bankruptcy of a local company is information of potentially great concern to residents of the community where the company is located; like the labor dispute at issue in *Thornhill,* such a bankruptcy "in a single factory may have economic repercussions upon a whole region." And knowledge about solvency and the effect and prevalence of bankruptcy certainly would inform citizen opinions about questions of economic regulation. It is difficult to suggest that a bankruptcy is not a subject matter of public concern when federal law requires invocation of judicial mechanisms to effectuate it and makes the fact of the bankruptcy a matter of public record. See *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975).

Given that the subject matter of credit reporting directly implicates matters of public concern, the balancing analysis the Court today employs should properly lead to the conclusion that the type of expression here at issue should receive First Amendment protection from the chilling potential of unrestrained presumed and punitive damages in defamation actions.[14]

---

advertising is instead a function of "greater objectivity and hardiness." *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc., supra,* at 772, n. 24.

[14] JUSTICE POWELL purports to draw from *Connick* v. *Myers,* 461 U. S. 138 (1983), a test for distinguishing matters of public concern from matters of private concern. This reliance perpetuates a definition of "public con-

## (2)

Even if the subject matter of credit reporting were properly considered—in the terms of JUSTICE WHITE and JUSTICE POWELL—as purely a matter of private discourse, this speech would fall well within the range of valuable expression for which the First Amendment demands protection. Much expression that does not directly involve public issues receives significant protection. Our cases do permit some diminution in the degree of protection afforded one category of speech about economic or commercial matters. "Commercial speech"—defined as advertisements that "[do] no more than propose a commercial transaction," *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376, 385 (1973)—may be more closely regulated than other types of speech. Even commercial speech, however, receives substantial First Amendment protection. *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U. S. 626 (1985); *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc., supra,* at 765 ("So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. . . . To this end, the free flow of commercial information is indispensable"). Credit reporting is not "commercial speech" as this Court has defined the term. Even if credit reporting were so considered, it would still be entitled to the substantial protections the First Amendment affords that category. See *Zauderer,* 471 U. S., at 637; *id.,* at 657–658 (BRENNAN, J., concurring in part and dissenting in part). Under either view, the expression at issue in this case should receive protection from the chilling potential of unrestrained presumed and punitive damages awards in defamation actions.

---

cern" wholly out of accord with our consistent precedents and with the common-law understanding of the concept. See *id.,* at 165, n. 5 (BRENNAN, J., dissenting). Moreover, *Connick* explicitly limited its distinction between public and private concern to the "context" of a government employment situation. *Id.,* at 148, and n. 8.

Our economic system is predicated on the assumption that human welfare will be improved through informed decision-making. In this respect, ensuring broad distribution of accurate financial information comports with the fundamental First Amendment premise that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press* v. *United States*, 326 U. S., at 20. The economic information Dun & Bradstreet disseminates in its credit reports makes an undoubted contribution to this private discourse essential to our well-being. Justice Douglas made precisely this point:

> "The language of the First Amendment does not except speech directed at private economic decisionmaking. Certainly such speech could not be regarded as less important than political expression. When immersed in a free flow of commercial information, private sector decisionmaking is at least as effective an institution as are our various governments in furthering the social interest in obtaining the best general allocation of resources. . . .
>
> "The financial data circulated by Dun & Bradstreet, Inc., are part of the fabric of national commercial communication." *Dun & Bradstreet, Inc.* v. *Grove*, 404 U. S. 898, 905–906 (1971) (Douglas, J., dissenting from denial of certiorari).

Justice Douglas further noted that "[p]resumably the credit reports published by the petitioner facilitate through the price system the improvement of human welfare at least as much as did the underlying disagreement in our most recent libel opinion, *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971), arising out of a squabble over whether a vendor had sold obscene magazines." *Id.*, at 905, n. 9.

The credit reports of Dun & Bradstreet bear few of the earmarks of commercial speech that might be entitled to somewhat less rigorous protection. In *every* case in which we have permitted more extensive state regulation on the basis of a commercial speech rationale the speech being regu-

lated was pure advertising—an offer to buy or sell goods and services or encouraging such buying and selling.[15]    Credit reports are not commercial advertisements for a good or service or a proposal to buy or sell such a product.    We have been extremely chary about extending the "commercial speech" doctrine beyond this narrowly circumscribed category of advertising because often vitally important speech will be uttered to advance economic interests and because the profit motive making such speech hardy dissipates rapidly when the speech is not advertising.    Compare *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557 (1980), with *Consolidated Edison Co.* v. *Public Service Comm'n of New York*, 447 U. S. 530 (1980).

It is worth noting in this regard that the common law of most States, although apparently not of Vermont, 143 Vt. 66, 76, 461 A. 2d 414, 419 (1983), recognizes a qualified privilege for reports like that at issue here.    See Maurer, Common Law Defamation and the Fair Credit Reporting Act, 72 Geo. L. J. 95, 99–105 (1983).    The privilege typically precludes recovery for false and defamatory credit information without a showing of bad faith or malice, a standard of proof which is often defined according to the *New York Times* formulation. See, *e. g., Datacon, Inc.* v. *Dun & Bradstreet, Inc.*, 465 F. Supp. 706, 708 (ND Tex. 1979).    The common law thus recognizes that credit reporting is quite susceptible to libel's chill; this accumulated learning is worthy of respect.

---

[15] See, *e. g., Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985); *Bolger* v. *Young Products Corp.*, 463 U. S. 60 (1983) (contraceptive advertising); *In re R. M. J.*, 455 U. S. 191 (1982) (lawyer advertising); *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490 (1981) (commercial billboard advertising); *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557 (1980) (advertising of electricity); *Friedman* v. *Rogers*, 440 U. S. 1 (1979) (optometrist advertising); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978) (lawyer's solicitation of business); *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977) (lawyer advertising).

Even if JUSTICE POWELL's characterization of the credit reporting at issue here were accepted in its entirety, his opinion would have done no more than demonstrate that this speech is the equivalent of commercial speech. The opinion, after all, relies on analogy to advertising. Credit reporting is said to be hardy, motivated by desire for profit, and relatively verifiable. *Ante*, at 762. But this does not justify the elimination of restrictions on presumed and punitive damages. State efforts to regulate commercial speech in the form of advertising must abide by the requirement that the regulatory means chosen be narrowly tailored so as to avoid any unnecessary chilling of protected expression. See *Zauderer, supra; Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc., supra; Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York, supra.*[16]

The Court in *Gertz* specifically held that unrestrained presumed and punitive damages were "unnecessarily" broad,

---

[16] Indeed JUSTICE POWELL has chosen a particularly inapt set of facts as a basis for urging a return to the common law. Though the individual's interest in reputation is certainly at the core of notions of human dignity, *ante*, at 757–758, citing *Rosenblatt* v. *Baer*, 383 U. S. 75, 92 (1966) (Stewart, J., concurring); see *Paul* v. *Davis*, 424 U. S. 693, 714 (1976) (BRENNAN, J., dissenting), the reputational interest at stake here is that of a corporation. Similarly, that this speech is solely commercial in nature undercuts the argument that presumed damages should be unrestrained in actions like this one because actual harm will be difficult to prove. If the credit report is viewed as commercial expression, proving that actual damages occurred is relatively easy. For instance, an alleged libel concerning a bank's customer may cause the bank to lower the credit limit or raise the interest rate charged that customer. The commercial context does not increase the need for presumed damages, but if anything reduces the need to presume harm. At worst the commercial damages caused by such action should be no more difficult to ascertain than many other traditional elements of tort damages. See, *e. g., Russell* v. *City of Wildwood*, 428 F. 2d 1176, 1181 (CA3 1970) (future earnings); *Seffert* v. *Los Angeles Transit Lines*, 56 Cal. 2d 498, 509, 364 P. 2d 337, 344 (1961) (Traynor, J., dissenting) (pain and suffering).

418 U. S., at 350, in relation to the legitimate state interests. Indeed, *Gertz* held that in a defamation action punitive damages, designed to chill and not to compensate, were *"wholly irrelevant"* to furtherance of any valid state interest. *Ibid.* The Court did not reach these conclusions by weighing the strength of the state interest against the strength of the First Amendment interest. Rather, the Court recognized and applied the principle that regulatory measures that chill protected speech be no broader than necessary to serve the legitimate state interest asserted. The plurality opinion today recognizes, as it must, that the state interest at issue here is identical to that at issue in *Gertz*. What was "irrelevant" in *Gertz* must still be irrelevant, and the requirement that the regulatory means be no broader than necessary is no less applicable even if the speech is simply the equivalent of commercial speech. Thus, unrestrained presumed and punitive damages for this type of speech must run afoul of First Amendment guarantees.[17]

(3)

Even if not at "the essence of self-government," *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964), the expression at issue in this case is important to both our public discourse and our private welfare. That its motivation might be the economic interest of the speaker or listeners does not diminish its First Amendment value. See *Consolidated Edison Co.*

---

[17] JUSTICE POWELL's analysis fails to apply the requirement that regulation be narrowly tailored. At one point the opinion reads: "This particular interest [in credit reporting] warrants no special protection when . . . the speech is wholly false and clearly damaging to the victim's business reputation." *Ante*, at 762. The point, of course, is not that false speech intrinsically deserves protection, see *Gertz*, 418 U. S., at 340, but that the burdening of unintentional false speech potentially chills truthful speech. Thus, the state interest in compensating injury resulting from false speech must be vindicated by means that are narrowly tailored to avoid this deleterious result.

v. *Public Service Comm'n of New York*, 447 U. S. 530 (1980). Whether or not such speech is sufficiently central to First Amendment values to require actual malice as a standard of liability, this speech certainly falls within the range of speech that *Gertz* sought to protect from the chill of unrestrained presumed and punitive damages awards.[18]

Of course, the commercial context of Dun & Bradstreet's reports is relevant to the constitutional analysis insofar as it implicates the strong state interest "in protecting consumers and regulating commercial transactions," *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 460 (1978). Cf. *Bolger* v. *Young Drug Products Corp.*, 463 U. S. 60, 81 (1983) (STEVENS, J., concurring in judgment). The special harms caused by inaccurate credit reports, the lack of public sophistication about or access to such reports, and the fact that such reports by and large contain statements that are fairly readily susceptible of verification, all may justify appropriate

---

[18]JUSTICE POWELL also relies in part on the fact that the expression had a limited circulation and was expressly kept confidential by those who received it. Because the subject matter of the expression at issue in this case would clearly receive the comprehensive protections of *Gertz* were the speech publicly disseminated, this factor of confidential circulation to a limited number of subscribers is perhaps properly understood as the linchpin of JUSTICE POWELL's analysis. See *ante*, at 762 (because of confidentiality "it cannot be said that the report involves any 'strong interest in the free flow of commercial information'") (plurality opinion) (citation omitted). See also n. 12, *supra*.

This argument does not save the analysis. The assertion that the limited and confidential circulation might make the expression less a matter of public concern is dubious on its own terms and flatly inconsistent with our decision in *Givhan* v. *Western Line Consolidated School Dist.*, 439 U. S. 410 (1979). Perhaps more importantly, Dun & Bradstreet doubtless provides thousands of credit reports to thousands of subscribers who receive the information pursuant to the same strictures imposed on the recipients in this case. As a systemic matter, therefore, today's decision diminishes the free flow of information because Dun & Bradstreet will generally be made more reticent in providing information to all its subscribers.

regulation designed to prevent the social losses caused by false credit reports.[19]  And in the libel context, the States' regulatory interest in protecting reputation is served by rules permitting recovery for actual compensatory damages upon a showing of fault.  Any further interest in deterring potential defamation through case-by-case judicial imposition of presumed and punitive damages awards on less than a showing of actual malice simply exacts too high a toll on First Amendment values.  Accordingly, Greenmoss Builders should be permitted to recover for any actual damage it can show resulted from Dun & Bradstreet's negligently false credit report, but should be required to show actual malice to receive presumed or punitive damages.  Because the jury was not instructed in accordance with these principles, we would reverse and remand for further proceedings not inconsistent with this opinion.

---

[19] See Maurer, Common Law Defamation and the Fair Credit Reporting Act, 72 Geo. L. J. 95, 126 (1983):

"Under *Gertz*, plaintiffs may be compensated for actual damages upon establishing the fault of the defendant; to obtain punitive damages, a plaintiff must demonstrate malice.  Sections 1681o and 1681n [of the Fair Credit Reporting Act] are consistent with these constitutional principles.  Section 1681o provides for recovery of actual damages upon a showing of negligence, which presumably satisfies the *Gertz* requirement of fault.  Section 1681n authorizes punitive damages for willful violation of the Act.  Whether section 1681n is equivalent to *Gertz*'s malice standard depends on whether a court would consider it to be possible to fail willfully to follow reasonable procedures and yet not manifest reckless disregard for the truth.  Such a fine distinction appears unworkable as a categorical test, so that section 1681n would likely be regarded as harmonious with the principles of *Gertz*.  Thus, the Act appears to provide the degree of protection for commercial speech currently required under first amendment doctrine" (footnotes omitted).