777 F.2d 1403
 28 Ed. Law Rep. 1017
 J. Placidio GARCIA, Plaintiff-Appellee, Cross-Appellant,
v.
BOARD OF EDUCATION OF the SOCORRO CONSOLIDATED SCHOOL
DISTRICT, Leo Lujan, Margene Harris, Daniel
Trujillo and David Shortess,
Defendants/Counter-
claimants/Appellants,
Cross-Appellees.
 Nos. 82-1174, 82-1185 and 82-1238.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 22, 1985.
 
 Kenneth J. Ferguson (Bruce Hall and Jo Saxton Brayer with him on brief) of Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N.M., for defendants/counter-claimants/appellants, cross-appellees.
 J. Douglas Compton, of Bovis, Kyle and Burch, Atlanta, Ga., for individual defendants as counter-claimants/appellants, cross-appellees.
 Ronald J. Van Amberg (Charles S. Solomon and Carl Bryant Rogers with him on brief) of Roth, Van Amberg & Gross, Santa Fe, N.M., for plaintiff-appellee, cross-appellant.
 Before HOLLOWAY, Chief Judge, and SETH and McKAY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff, Superintendent of the Socorro Consolidated School District of New Mexico, brought a section 1983[1] action alleging violation of his first amendment rights and claiming that he was deprived of liberty and property without due process. His claims arose out of the school board's decision not to renew his contract. Plaintiff named the Board of Education and the members who voted against renewing his contract as defendants. The members were named in both their individual and official capacities. During trial, plaintiff dropped the claims against the board members in their individual capacities.
 
 
 2
 Initially, the board gave no public reasons for its decision not to renew the plaintiff's contract. Upon learning about the nonrenewal, plaintiff made statements to various persons that his contract was not being renewed because he had refused to let the board coerce him into performing an illegal act. After these statements were republished in the local newspapers, the board held a special meeting to draft a statement discussing the reasons for nonrenewal of plaintiff's contract. The reasons--which included conduct detrimental to staff morale, that plaintiff was hard to work with, and that constituents were unhappy--were announced publicly and reprinted in local newspapers. Based on the dismissal and the statement drafted by the board, plaintiff filed this action alleging denial of first amendment, property, and liberty rights. The board members counterclaimed for defamation.
 
 
 3
 The trial judge instructed the jury on plaintiff's liberty claim, but refused to instruct on either the first amendment or property claims. As to the counterclaim, the court instructed the jury that, in order to recover on their defamation claim, the school board members, as public officials,[2] must prove that plaintiff's statements were made with "actual malice." The jury awarded plaintiff $180,000 and defendants nothing.
 
 
 4
 On appeal, plaintiff challenges the trial court's refusal to instruct the jury on the first amendment and property claims. The school board members argue that the trial court erred in failing to direct a verdict on plaintiff's liberty claim, and they challenge the trial court's finding that they were bound by the actual malice standard of proof. They also argue, for the first time on appeal, that they are immune from suit under the eleventh amendment.
 
 I. ELEVENTH AMENDMENT
 
 5
 Initially, the issues raised on appeal and addressed in the parties' briefs were limited to the trial court's handling of the first amendment, due process, and defamation claims. Shortly after the briefs were filed, the school board members submitted a letter to this court asserting that the school district and board members in their official capacities enjoy eleventh amendment immunity. The eleventh amendment claim was addressed at oral argument although not yet fully briefed. Three sub-issues are important: (1) whether the issue was timely raised; (2) whether the board members are estopped from raising the issue; and (3) if the issue is properly before the court and estoppel does not apply, whether the school board is in fact entitled to immunity.
 
 
 6
 A. Was the Eleventh Amendment Defense Timely Raised?
 
 
 7
 The board members raised the eleventh amendment as a defense in their Answer, First and Second Amended Answers, and in the Pre-Trial Order. Apparently, however, they did not pursue the defense, and the trial judge failed to rule on it. An eleventh amendment defense is jurisdictional and may be raised for the first time on appeal. Edelman v. Jordan, 415 U.S. 651, 677-78, 94 S.Ct. 1347, 1362-63, 39 L.Ed.2d 662 (1974) (citing Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 466-67, 65 S.Ct. 347, 351-52, 89 L.Ed. 389 (1945)). Further, it may be argued on appeal even if it was raised but abandoned at the trial level. See Sosna v. Iowa, 419 U.S. 393, 396 n. 2, 95 S.Ct. 553, 555 n. 2, 42 L.Ed.2d 532 (1975). The plaintiff argues that Patsy v. Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), retreated from the broad holdings of Edelman and Ford Motor. However, since Patsy, the Supreme Court has reaffirmed that an eleventh amendment defense may be raised at any time in the proceedings. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99 n. 8, 104 S.Ct. 900, 907 n. 8, 79 L.Ed.2d 67 (1984). We sympathize with the trial court and the plaintiff when they have been "sand bagged" as they were on this issue. However, the cases dictate this post-trial revision of the issues.
 
 
 8
 B. Are the Defendants Estopped from Raising the Defense?
 
 
 9
 The plaintiff further asserts that the school board should be estopped from raising the eleventh amendment defense. The action was initially against the board members in both their individual and official capacities. During trial, plaintiff dropped his claims against the board members in their individual capacities. Three exchanges between the court and the attorneys are important. In the first exchange, the court addressed the plaintiff's attorney and asked him whether plaintiff wanted a jury instruction for punitive damages. The judge suggested that explaining and distinguishing between the claims against defendants in their individual and official capacities would confuse the jury. In essence, the court recommended that plaintiff drop one of the claims, preferably the claim against defendants in their individual capacities. Although present, the school board's attorney did not participate in this exchange. Record, vol. 3, at 171-73. On the next day of trial, the court again addressed plaintiff's attorney, inquiring whether any decision had been made about dropping one of the claims. Plaintiff's attorney, noting that he had conferred with his client and with co-counsel, informed the court that plaintiff wanted to drop the claim against defendants in their individual capacities. The defense attorney's only participation in this exchange was to state that he and the defendants' insurer had no problem with this decision. Record, vol. 4, at 4-5. Then, in chambers, when the trial judge and attorneys for both plaintiff and defendants discussed the final version of the jury instructions, the following conversation took place:
 
 
 10
 THE COURT: [T]he instructions are drafted as against the Defendants strictly in their official capacities. I understood that's the way the Plaintiff wanted it. Therefore, that takes out any issue of punitive damages and also any issue of good faith. So if there's no hooker--There's no problem; if the Plaintiff is entitled to a verdict, its recoverable. I assume that's true.
 
 
 11
 [Defense Counsel]: That's true, Your Honor.
 
 
 12
 * * *
 
 
 13
 THE COURT: I mean if the Plaintiff were recovering, then all at once the school district will not respond or claim some kind of immunity or something.
 
 
 14
 [Defense Counsel]: No. They probably would not have the money, but there's no problem with that.
 
 
 15
 [Plaintiff's Counsel]: Of course, if there's nothing with the County, the Constitution provides for that.
 
 
 16
 Record, vol. 5, at 42-43.
 
 
 17
 Thus it appears that, had the school board's attorney indicated that an eleventh amendment defense would be further pursued, the trial court might have reconsidered its recommendation that plaintiff drop his claim against the defendants in their individual capacities. Further, when the court gave the parties the opportunity to preserve the record by making objections, defendants did not object to the court's failure to rule on the defense.
 
 
 18
 However, the parties fail to address the issue of whether the school board's attorney has the authority to waive sovereign immunity. Sovereign immunity in New Mexico is now a statutory creation. In Hicks v. State, 88 N.M. 588, 544 P.2d 1153 (1975), the New Mexico Supreme Court abolished common law sovereign immunity. In response, the legislature enacted the Tort Claims Act, reinstating governmental immunity except in eight classes of activity. N.M.Stat.Ann. Secs. 41-4-4 to -12 (1978). None of the eight exceptions apply to this case. Under section 41-4-4, waiver of immunity is limited to and governed by N.M.Stat.Ann. Secs. 41-4-13 to -25 (1978). These sections do not authorize the school board's attorney to waive sovereign immunity. Thus we find that the school board is not estopped from raising eleventh amendment immunity at this time.
 
 
 19
 C. Do the Local School Board Members in Their Official Capacity Enjoy the State's Sovereign Immunity under the Eleventh Amendment?
 
 
 20
 A nonconsenting state is immune from suit brought in federal court by her own citizens as well as by citizens of another state. See Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Further, a suit in a federal court against the members of a state board or agency acting in their official capacities is a suit against the board or agency itself, and is subject to the eleventh amendment immunity restriction. However, since Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), created a constitutional dichotomy between state and local functions, it has been necessary in suits against agencies to determine whether the agency sued is the alter ego of the state. If the agency is the alter ego, it enjoys the eleventh amendment immunity of the state. If it is "local" as defined by the cases, it does not enjoy that eleventh amendment immunity. Thus, determination of that issue is a matter of federal law and is made by examining the relationship between the state and the entity being sued.
 
 
 21
 This court has recently considered whether local school boards in New Mexico are to be considered state or local entities for eleventh amendment purposes, and has concluded that they should be considered arms of the state. Martinez v. Board of Education of the Taos Municipal School District, 748 F.2d 1393 (10th Cir.1984); Maestas v. Board of Education of the Mora Independent School District, 749 F.2d 591 (10th Cir.1984). We are bound by these decisions. The eleventh amendment therefore bars this suit against the school board and its members in their official capacities.
 
 II. DEFAMATION (Cross Appeal)
 
 22
 On cross-appeal, the defendant school board members in their individual capacities complain that the trial court erroneously instructed the jury on their defamation claim.
 
 
 23
 The trial court instructed the jury that, in order to recover on their defamation claim, the school board members, as public officials, must prove that Mr. Garcia's statement was made with "actual malice" as mandated by New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[3] The school board members challenge the instruction, arguing that they need only prove common law negligence because they are not public officials and that, even if they are public officials, the New York Times standard applies only to "media" defendants.
 
 
 24
 The Supreme Court has enunciated tests for determining whether someone is a public official or figure.[4] In Rosenblatt v. Baer, 383 U.S. 75, 85, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966), the Court held that the " 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." In Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 40 L.Ed.2d 789 (1974), the Court stated that public figures are those who "assume special prominence in the resolution of public questions." The Court noted that one could become a public figure in one of two ways: (1) by achieving such personal fame and notoriety that he becomes a public figure for all purposes; or (2) by voluntarily becoming involved or being drawn into a public controversy and thereby becoming a public figure as to the issues involved in that controversy. Id. at 351, 94 S.Ct. 3012.
 
 
 25
 The school board members make a variety of arguments as to why they do not fall within these definitions: They are not "employees" because they do not get paid and are elected; their position is not one that the public perceives as having substantial responsibility over the conduct of government affairs; their power is merely local; and the public would not scrutinize their activities absent the controversy at issue in this case. The school board's arguments, however, are not persuasive. Courts have often considered elected city officials to be within the definition of public officials. See, e.g., New York Times, 376 U.S. at 283 n. 23, 84 S.Ct. at 727 n. 23 (city commissioner); Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 299, 91 S.Ct. 628, 631, 28 L.Ed.2d 57 (1971) (city mayor); Fadell v. Minneapolis Star & Tribune Co., 557 F.2d 107, 108 (7th Cir.), cert. denied, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977) (elected township tax assessor); Dostert v. Washington Post Co., 531 F.Supp. 165, 166 n. 1 (D.W.Va.1982) (elected judge). As the Supreme Court noted in Gertz, "An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs." 418 U.S. at 344, 94 S.Ct. at 3009.
 
 
 26
 Further, we reject the board members' argument that they are not public officials because the public would not scrutinize their decisions absent the instant controversy and because the public does not perceive them as having substantial responsibility over the conduct of government affairs. Clearly, the governance of a public school system is of the utmost importance to a community, and school board policies are often carefully scrutinized by residents. Members of the local school board, who are elected to make decisions regarding local education, clearly "have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." Rosenblatt, 383 U.S. at 85, 86 S.Ct. at 675. The strong public interest in ensuring open discussion of their job performance warrants the conclusion that school board members are public officials.
 
 
 27
 The scope of the constitutional protection established in New York Times is a more troublesome issue. Although in New York Times itself the Supreme Court specifically required a public-official defamation plaintiff to prove that both the "media" and private individual defendants made defamatory statements with actual malice, the board members argue that Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), cut back on New York Times by limiting the constitutional protection only to "media" defendants.
 
 
 28
 In analyzing New York Times and its progeny, the crux of the issue before us is whether there is any compelling reason why a private "nonmedia" defendant should be afforded less protection than a "media" defendant when discussing matters of public importance involving a public official. In other words, should a public official who sues for defamation find it easier to obtain a judgment against a "nonmedia" critic of his official conduct than he would against a "media" critic?In New York Times, the Court made repeated statements extolling the purposes of the first amendment, using the terms "freedom of expression," "freedoms of speech and press," "freedom of speech," and "freedom of the press." While the Court at times discussed freedom of the press and freedom of speech separately, it did not appear to make any distinction between the two in terms of the amount of protection to which they are entitled. Nor did the specific holding of the case limit the privilege to the media: "We hold today that the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." New York Times, 376 U.S. at 283, 84 S.Ct. at 727. The Court's reasoning focused on protecting open public debate critical of official conduct, not on the identity of the criticizing speaker.
 
 
 29
 Subsequently, in Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (criminal defamation action), and Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965), the Court applied the actual malice standard to public official defamation plaintiffs suing nonmedia defendants without specifically considering whether the character of the disseminator of the information was significant. Instead, the Court again focused on the character of the defamation plaintiff as a public official. In Garrison, the Court termed the New York Times rule the "public-official rule," protecting "the paramount public interest in a free flow of information to the people concerning public officials, their servants." 379 U.S. at 77, 85 S.Ct. at 217. "[W]here the criticism is of public officials and their conduct of public business, the interest in private reputation is overborne by the larger public interest, secured by the Constitution, in the dissemination of truth." Id. at 72-73, 85 S.Ct. at 214-15.
 
 
 30
 Then, in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court considered the case of a private plaintiff suing a media defendant. The Court's holding can be summarized as follows: (1) "Public officials" and "public figures" may recover for defamation only on a New York Times malice showing, id. at 343, 94 S.Ct. at 3008; (2) the states may define appropriate standards of liability respecting private plaintiffs "so long as they do not impose liability without fault," id. at 347, 94 S.Ct. at 3010; and (3) no plaintiff may recover presumed or punitive damages, "at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." Defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth are limited to "compensation for actual injury." Id. at 349, 94 S.Ct. at 3011.
 
 
 31
 The majority in Gertz repeatedly employed terms such as "newspaper or broadcaster," "press and broadcast media," "publisher or broadcaster," and "media," and the Court phrased its holding in terms of publishers and broadcasters. Id. at 347, 94 S.Ct. at 3010. Further, the actual injury segment of the holding spoke of "publishers and broadcasters." Id. at 350, 94 S.Ct. at 3012. The Court's language and apparent focus on freedom of the press generated considerable speculation as to whether Gertz 's requirements concerning fault and actual damages were limited to defamation by "media" defendants, and whether the Supreme Court might apply the Gertz rationale, focusing on freedom of the press, to cases involving public-official plaintiffs and nonmedia defendants.
 
 
 32
 The Supreme Court recently had the opportunity to decide whether the New York Times rule should be limited to media defendants in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., --- U.S. ----, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). While Justice Powell, writing for the Court, did not reach the issue, five members of the Court expressly rejected a distinction between media and nonmedia defendants. Justice Brennan, in a dissent joined by Justices Marshall, Blackmun and Stevens, explained:
 
 
 33
 Such a distinction is irreconcilable with the fundamental First Amendment principle that "[t]he inherent worth of ... speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual."
 
 
 34
 105 S.Ct. at 2957 (quoting First National Bank of Boston v. Bellotti, 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978)). Similarly, Justice White stated:
 
 
 35
 I agree with Justice Brennan that the First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech. None of our cases affords such a distinction; to the contrary, the Court has rejected it at every turn.
 
 
 36
 105 S.Ct. 2953 (White, J., concurring in judgment).[5]
 
 
 37
 Such a rejection of the defendants' suggested distinction accords with the principles underlying the New York Times rule and the first amendment. Criticism of the functioning and integrity of local government is exactly the type of speech the first amendment was intended to protect. "Criticism of the government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." Rosenblatt, 383 U.S. at 85, 86 S.Ct. at 675. First amendment protection should not depend on whether the criticism is in the form of speech by a private individual or publication by the institutional press. Indeed, the law should encourage the private individual to become involved in and express his or her views on the conduct of government affairs. Arguably, vigorous debate at the local level is vastly more important in shaping an individual's ideas and opinions as to proper government conduct than is what that individual reads or hears from the national media. The bulk of government is conducted on the level where matters of public concern are decided by personal, individual exchanges. See Watkins & Schwartz, Gertz and the Common Law: Of Fault, Nonmedia Defendants, and Conditional Privileges, 15 Tex.Tech.L.Rev. 823, 849-50 (1984). Furthermore, at this absolutely central level of government, the education and aculturation of new members of society is carried on at a scale where there is no assurance at all that any media will cover, report, or otherwise carry on the open and vigorous debate essential to a free society. Only an urban oligarch could be oblivious to the real dynamics of democracy carried on in "local" school board meetings, often too dull or localized to attract those who profit financially from selling "news." To withhold the protections of the first amendment from nonmedia participants in the political process would be to stand the amendment on its head without the slightest justification.
 
 
 38
 The focus of the analysis, in determining whether actual malice is required, must be on the subject of the speech, not on the identity of the speaker. The rationale of New York Times was two-fold: (1) a commitment to "the principle that debate on public issues should be uninhibited, robust, and wide-open"; and (2) that such debate "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times, 376 U.S. at 270, 84 S.Ct. at 720; Rosenblatt, 383 U.S. at 85, 86 S.Ct. at 675. The traditional reasons for requiring proof of actual malice when the speech is critical of public officials--the need for open debate regarding official actions, a public official's presumed access to the press for rebuttal, and the official's presumed consent to criticism by accepting the position--are applicable regardless of whether the speaker is a private individual or the institutional press. Indeed, it would be irrational to require the private individual, whose criticism reaches a smaller audience and therefore has less potential for harm, to meet a higher standard than the press, with its vast resources and audience.
 
 
 39
 Further, we would be creating definitional monsters by attempting to define "press" and "media." Does media refer merely to institutional national newspapers, magazines, and television; or does it include the lone tax protester running off copies of his handwritten newsletter on his home photocopier? Changing technology alone would deter attempts to fashion a legal distinction between "media" and "nonmedia." As Justice Brennan noted, any distinction "would likely be born an anachronism." Dun & Bradstreet, Inc., 105 S.Ct. at 2958 & n. 7 (Brennan, J., dissenting).
 
 
 40
 The crucial elements which brought the United States Supreme Court into the field of defamation law are present here. To create sanctions against a private person criticizing local government officials' conduct of governmental affairs would threaten the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open...." New York Times, 376 U.S. at 270, 84 S.Ct. at 720. There is "a strong interest in debate on public issues ... and ... a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." Rosenblatt, 383 U.S. at 85, 86 S.Ct. at 675. These constitutional values, the difficulty of defining "media," and the undesirability of carving out a greater constitutional protection for the media all mandate that, at least when a public-official plaintiff is suing a non-media defendant for defamation, the New York Times actual malice standard should apply. Therefore, the trial court correctly instructed the jury that the defendants could recover on their counterclaims only if they could show that the plaintiff acted with actual malice.
 
 
 41
 We reverse the judgment in favor of the plaintiff and remand it for dismissal on the grounds of eleventh amendment immunity. Because the trial court correctly instructed the jury regarding the counterclaim, we affirm the verdict against the counter-claimants.
 
 
 42
 McKAY, Circuit Judge, concurring in part and dissenting in part:
 
 
 43
 I concur in the majority's holding that the standard of proof in a defamation suit by a public official does not vary depending on whether the defendant is a member of the media. I also agree that the defendants' eleventh amendment defense can be raised for the first time on appeal. I cannot agree, however, that the defendants in this case--a local school board and its members--are protected from suit under the eleventh amendment. Accordingly, I must dissent.
 
 
 44
 The issue on which I cannot concur is whether the school board of Socorro Consolidated School District is an arm of the state protected from suit by the eleventh amendment, or a local entity subject to suit. The majority finds that the school board is an arm of the state, relying on what I consider to be an ambiguous statutory provision regarding how a judgment against the board would be funded. In doing so, the majority ignores the realities of the situation. A local school board is universally viewed as a local entity. Its members are locally elected or appointed, and those local members make decisions about the governance of the local schools. An ambiguous state funding device designed to pay all local tort and civil rights obligations cannot and should not alter the board's fundamentally local status.
 
 
 45
 This case demonstrates clearly the mischief caused by forcing the courts to make a distinction between "state" and "local" entities for eleventh amendment purposes and, more importantly, by making that analysis turn on the source of the funds to pay the judgment. This mischief began when the Supreme Court decided, in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1977), that municipalities and "local government units" are subject to suit under Sec. 1983. The Court noted that its holding was, "of course, limited to local government units which are not considered part of the state for Eleventh Amendment purposes." 436 U.S. at 690 n. 54, 98 S.Ct. at 2035 n. 54. Since Monell, the courts have struggled to determine which local government units are more like a municipality and which are more like an arm of the state. The result has been inconsistency and confusion.
 
 
 46
 The leading Supreme Court decision on the issue of whether a school board is an arm of the state is Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). There, the Court found that the petitioner, an Ohio school district, did not enjoy the state's eleventh amendment immunity. The Court balanced the following factors: (1) statutory definitions--"[u]nder Ohio law the 'state' does not include 'political subdivisions,' and 'political subdivisions' do include local school districts"; (2) the number of local boards--there were "many" within the state; (3) the degree of supervision and control by the state over local boards--the school board was subject to "some guidance from the State Board of Education"; (4) the amount of state financial assistance--the local board received "a significant amount of money from the state"; and (5) the power of the local boards to issue bonds and levy taxes--school boards in Ohio could do both. Id. at 280-81, 97 S.Ct. at 572-73. Thus, Mt. Healthy established an objective standard. As a result, the substantive form of operation, not the state's characterization of the entity, governs the immunity decision.[1]
 
 
 47
 In applying the Mt. Healthy standards, this court has relied primarily on a two-part balancing test to distinguish state alter egos from local units of government. In employing that test, we first must determine the extent to which the board, although carrying out a state mission, functions with substantial autonomy from the state government. In other words, we must ask: Who carries out the day-to-day activities which are likely to give rise to a federal civil rights action? The emphasis for determining control is not on who sets the broad general policy, but on who carries out the day-to-day activities such as hiring, firing, ownership of property, entering contracts for service, control and disbursement of money, and other activities indicative of day-to-day management. The mere fact that the state board sets policy and nominally has the power to overturn decisions of the local school board is of little consequence unless the state board is involved in the local board's managerial decisions. See Unified School District No. 480 v. Epperson, 583 F.2d 1118, 1121-23 (10th Cir.1978). Second, we must consider the extent to which the agency is financed independently of the state treasury. Id. at 1121-22. The primary focus in the second part of the test is on the source of the money that would be used to pay a judgment against the board. If the money for the judgment against the board would be paid out of the state treasury, the board is immune. Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); Epperson, 583 F.2d at 1122.
 
 
 48
 The last part of the test--whether the judgment will be paid from state or local funds--has become the key to the analysis and, in the process, has created the problems which I find in the two related cases which govern the majority's opinion. Martinez v. Board of Education of the Taos Municipal School District, 748 F.2d 1393 (10th Cir.1984); Maestas v. Board of Education of the Mora Independent School District, 749 F.2d 591 (10th Cir.1984). The absurd result of this focus on funding has been to find school districts in some states to be local entities while finding others, similarly situated and possessing similar powers, to be arms of the state. Compare Epperson, 583 F.2d at 1122 (Kansas school district is local because judgment would be paid "from monies raised by special levy within the school district itself") and Stoddard v. School District No. 1, 590 F.2d 829, 835 (10th Cir.1979) (Wyoming school district is "more like a city or county than it is like an arm of the state") with Harris v. Tooele County School District, 471 F.2d 218, 220 (10th Cir.1973) (Utah school district is state entity because "the possibility exists that a money judgment rendered in federal court ... might be paid at least partially out of state funds").
 
 
 49
 In each of these cases, the state had chosen to operate the schools through a system of local school boards. There was no significant difference in the powers granted to those school boards, or the control which they exercised over their own affairs. For example, both the Kansas and Utah school boards were empowered to "sue and be sued, and to take hold, lease, sell, and convey real and personal property." Epperson, 583 F.2d at 1122-23; Harris, 471 F.2d at 222 (Holloway, J., dissenting). Indeed, as the dissent in Harris pointed out, school districts in Utah had the power, as did those in Kansas and Wyoming, to levy special taxes to pay their judgments and to purchase liability insurance. The only real difference between the school districts was that Utah school districts were not required to levy taxes to pay their liabilities, so the judgment might have to be paid by the state. See Epperson, 583 F.2d at 1123 (distinguishing Harris on this ground). It is absolutely ridiculous, in my view, to treat school boards, otherwise similarly situated, differently because of such a possibility. If a state chooses to operate its schools through local school districts, subject to local control, it should be bound by the eleventh amendment consequences of that choice.
 
 
 50
 The absurdity caused by the focus on funding is epitomized by this case. While article twelve, section six, of the New Mexico Constitution provides that the State Board of Education has ultimate control of the school system in New Mexico, that constitutional provision leaves in the Legislature the power to provide the details of the operation of the school system. Thus we must look to the implementing statutes in order to determine whether the forum of management and control is at the local or state level. The New Mexico statutory scheme shows a clear intent to maintain local control over the schools. Powers and responsibilities allocated to the numerous local school boards by the Legislature are as follows:
 
 
 51
 A. subject to the regulations of the state board, supervise and control all public schools within the school district, and all property belonging to or in the possession of the school district;
 
 
 52
 B. employ a superintendent of schools for the school district and fix his salary;
 
 
 53
 C. delegate administrative and supervisory functions of the local school board to the superintendent of schools;
 
 
 54
 D. subject to the provisions of law, approve or disapprove the employment or discharge of all employees and certified school personnel of the school district upon a recommendation of employment or discharge by the superintendent of schools;
 
 
 55
 E. fix the salaries of all employees and certified school personnel of the school district;
 
 
 56
 F. contract, lease, purchase and sell for the school district;
 
 
 57
 G. acquire and dispose of property;
 
 
 58
 H. have capacity to sue and be sued;
 
 
 59
 I. acquire real estate by eminent domain as in the case of railroads;
 
 
 60
 J. issue general obligation bonds of the school district;
 
 
 61
 K. repair and maintain all property belonging to the school district;
 
 
 62
 L. for good cause and upon order of the district court, subpoena witnesses and documents in connection with a hearing concerning any powers or duties of the local school board;
 
 
 63
 M. except for expenditures for salaries, contract for the expenditure of money according to the provisions of Sections 6-5-1 through 6-5-11.1 [N.M.Stat.Ann. (1953) ];N. adopt regulations pertaining to the administration of all powers or duties of the local school board;
 
 
 64
 O. accept or reject any charitable gift, grant, devise or bequest. The particular gift, grant, devise or bequest accepted shall be considered an asset of the school district or the public school to which it is given; and
 
 
 65
 P. to offer, and upon compliance with the conditions of such offer, to pay rewards for information leading to the arrest and conviction or other appropriate disciplinary disposition by the courts or juvenile authorities of offenders in case of theft, defacement or destruction of local school district property. All such rewards shall be paid from school district funds in accordance with regulations which shall be promulgated by the chief of the public school finance division [director of public school finance].
 
 
 66
 N.M.Stat.Ann. Sec. 22-5-4 (1978).
 
 
 67
 When viewed in context, the functions allocated to the local school board are obviously those of day-to-day management and control. They are the kinds of activities which would normally give rise to liability either in civil matters or pursuant to federal civil rights statutes. By way of contrast, the duties of the state board, which if sued would be immune, are the typical broad policy functions of state-wide boards and do not involve day-to-day management or operation. Among the state board's duties are (1) determining policy for the operation of all public schools in the state; (2) designating courses of instruction to be taught in public schools; (3) determining teacher qualifications; (4) prescribing graduation requirements; and (5) taking over school districts where the local governing bodies fail to abide by state law in operating the schools. N.M.Stat.Ann. Sec. 22-2-2 (1978). In addition, New Mexico law provides that the Public School Finance Division has substantial control over the preparation of school districts' annual budgets. N.M.Stat.Ann. Sec. 22-8-4 (1978).
 
 
 68
 It is significant that the statutory allocation of function itself contemplates local operation by providing that the state shall provide management only when the local governing body has failed to abide by state law in operating the schools. N.M.Stat.Ann. Sec. 22-2-2(V) (1978). Thus I believe that, in context, the form selected for the operation of schools in the State of New Mexico is local, with broad general state supervision and policymaking, rather than state-retained operative responsibility. The New Mexico school system thus is like the one which the Supreme Court found to be local in Mt. Healthy, 429 U.S. at 280, 97 S.Ct. at 572 (board subject to "some guidance" from State Board of Education), and the Kansas school board which this court found to be local in Epperson, 583 F.2d at 1123 (local board subject to "general supervision" of state board). While the state has general oversight powers, this should not obscure the fact that the statutory scheme allows the day-to-day decisions--those likely to give rise to federal civil rights claims--to be made at the local level. In reality, the board functions as a local entity and should be treated as such.
 
 
 69
 However, Martinez, 748 F.2d at 1395-96, and Maestas, 749 F.2d at 591, focused on the source of the money used to pay judgments against local New Mexico school boards. Consequently, the majority in this case finds the local board to be an alter ego of the state. I cannot agree.
 
 
 70
 It is undisputed that most of the money for New Mexico public schools comes from state appropriations rather than local funds.[2] This receipt of state funding does not, however, alter the fact that decisions are made at the local level, and that funding alone should not convert the local body into an arm of the state. Indeed, the Supreme Court has recognized that "a significant amount" of state funding does not make a school board a state entity. Mt. Healthy, 429 U.S. at 280, 97 S.Ct. at 572. Moreover, if receipt of state financing were the key to eleventh amendment immunity, virtually all local entities would have to be considered arms of the state (including municipalities, which the Supreme Court has held not to be protected by the eleventh amendment). Monell, 436 U.S. at 690 n. 54, 98 S.Ct. at 2035 n. 54. All local bodies are, at least in part, state funded. Indeed, most receive federal funding as well. When a "local" body is part state-financed and part locally financed, it is often impossible to isolate the source of the funds which it will use to pay a judgment. Most of these bodies do not segregate their budget according to the source of the funds. Thus, if a body receives any state money, there is a possibility that state money will be used to pay a judgment. This possibility should not determine eleventh amendment immunity. The source of funds is a result of who collects the taxes--not of who is running the school board. By focusing on financing, the courts have distorted the analysis and ignored or overridden what should, in my view, be the crucial consideration--who is making the decisions which affect constitutional rights.
 
 
 71
 The present case makes clear the difficulty of trying to isolate the source of funds, for my reading of the statutes convinces me that the New Mexico legislature has not expressly provided a method for paying federal civil rights judgments. The two cases relied on by the majority, construing N.M.Stat.Ann. Sec. 41-4-20 (1978), find that the judgment will be paid either out of the budgeted reserves required by the New Mexico Tort Claims Act or out of the New Mexico Public Liability Funds created by that Act. Martinez, 748 F.2d at 1396; Maestas, 749 F.2d at 592. However, the provision on which they rely covers only "risk[s] for which immunity has been waived under the provisions of the Tort Claims Act." N.M.Stat.Ann. Sec. 41-4-20(A) (1978). The Tort Claims Act appears to waive immunity only for suits brought in the district courts of New Mexico. Id. Sec. 41-4-18(A).[3] Thus, the risk coverage provisions of sections 41-4-20 through 41-4-27 would not apply to a federal court judgment such as would issue in this case. In addition, since the state has not waived state sovereign immunity from constitutional claims against public employees such as school board members,[4] the risk coverage provisions would not apply to a judgment in this case even if they were construed to cover federal court judgments. Contrary to the assumption implicit in the majority's position, therefore, a judgment probably would not be paid out of this state fund.
 
 
 72
 The plaintiff argues that the money for a judgment would come from a local tax levy and that the school board should therefore be considered a local entity. The New Mexico Constitution provides for tax levies for satisfaction of money judgments against school districts and school boards, stating:
 
 
 73
 No execution shall issue upon judgment rendered against ... any ... school district or board of education; or against any officer of any ... school district or board of education, upon any judgment recovered against him in his official capacity and for which the ... school district or board of education, is liable, but the same shall be paid out of the proceeds of a tax levy as other liabilities of ... school districts or boards of education, and when so collected shall be paid by the county treasurer to the judgment creditor.
 
 
 74
 N.M. Const. art. VIII, Sec. 7 (amended Nov. 3, 1914).
 
 
 75
 However, the constitutional section is not self-executing. McAtee v. Gutierrez, 48 N.M. 100, 106, 146 P.2d 315, 318 (1944). While this constitutional authority has been implemented by statute, the statutory provision sweeps less broadly than does the constitutional one. Section 7-37-7(C)(3) authorizes the school to assess
 
 
 76
 those rates or impositions necessary for the use of a governmental unit to pay a tort or workmen's compensation judgment for which a county, municipality or school district is liable, subject to the limitations in Subsection B of Section 41-4-25 [N.M.Stat.Ann. (1978) ], but no rate or imposition shall be authorized to pay any judgment other than one arising from a tort or workmen's compensation claim.
 
 
 77
 N.M.Stat.Ann. Sec. 7-37-7(C)(3) (1978) (emphasis added). The opinion relied on by the majority finds this provision inapplicable because "suits for violations of federal constitutional rights are not tort actions." Martinez, 748 F.2d at 1396.[5] While it is true that constitutional claims are not technically tort claims, the Supreme Court has recently made clear that constitutional claims are analogous to actions sounding in tort. Wilson v. Garcia, --- U.S. ----, 105 S.Ct. 1938, 1947-48, 85 L.Ed.2d 254 (1985) (holding that section 1983 actions are best analogized to "tort action[s] for recovery of damages for personal injuries" for statute of limitations purposes). Thus one could argue, as does the plaintiff, that this section, which authorizes tax levies to pay tort claims, includes the authority to levy taxes to pay for analogous constitutional judgments.
 
 
 78
 The problem, however, is that the New Mexico Legislature has clearly distinguished between constitutional claims and torts in other contexts. For example, in the Tort Claims Act, the Legislature provided that the state will defend a public employee against a claim for any tort or any violation of property rights or any rights, privileges, or immunities secured by the Constitution of the United States. N.M.Stat.Ann. Sec. 41-4-4(B) (1978) (emphasis added). Similarly, section 41-4-12 waives immunity for specific torts and for the violation of constitutional rights when committed by law enforcement officers. Relying on these provisions, the New Mexico Supreme Court has stated that the New Mexico Legislature recognizes that "a tort is separate and distinct from a constitutional deprivation." Wells v. County of Valencia, 98 N.M. 3, 6, 644 P.2d 517, 520 (1982). There is thus a strong indication that, when the New Mexico Legislature authorized tax levies to pay "tort" judgments, it did not intend the word "tort" to encompass what it viewed as separate and distinct constitutional deprivations.
 
 
 79
 Since neither the risk coverage provisions of the Tort Claims Act nor the tax levy statute authorize payment of a federal court judgment on a constitutional claim, there is no clear statutory indication of how such a judgment would be paid. In the absence of specific authority, I can only assume that it would be paid from the general funds of the school district and, if the district lacks funds, from the general funds of the state. Thus, I concede that there is a "possibility," Harris, 471 F.2d at 220, that a federal court judgment will be paid out of funds derived from the state. However, I cannot agree that the fortuity of the source of funds--a question which the New Mexico Legislature does not appear to have considered--should determine eleventh amendment immunity. Indeed, the uncertainty of the source of payment in this case highlights the absurdity of having the eleventh amendment immunity of a "local" entity turn on the source of the funds to pay a judgment.
 
 
 80
 If we are going to continue to distinguish between local bodies and the state for eleventh amendment purposes, we must make the distinction on a principled and rational basis. The analysis should focus, not on financing (which most local bodies will derive from numerous sources) but rather on the degree to which the local entity acts independently of the state. This approach, applying an aspect of the Mt. Healthy and Epperson tests, provides an analytically sound basis for finding a local body to be an arm of the state and protected by the state's immunity. If the state is controlling the local body to the extent that it is making the decisions which affect the constitutional rights of its citizens, then the state's immunity should shield the local entity from suit. If, however, the state chooses to allow the body to function independently and to make the decisions that affect the constitutional rights of others, then the local body should be liable for its decisions. The state should not be able to immunize local decisionmaking through funding devices such as public liability funds designed to pay the tort and civil rights liabilities of all state and local bodies. If the state wants to immunize the local governmental bodies, it must maintain control--not merely general supervision--over their actions.
 
 
 81
 Because I believe that New Mexico school boards act independently of the state in the day-to-day management of the school district, with only general supervision by the state, I would find that the school board is not immune from suit under the eleventh amendment.
 
 II. PLAINTIFF'S SECTION 1983 CLAIM
 
 82
 Having determined that the local school board is subject to suit under the state/local dichotomy spelled out in Monell, I would reach the question whether the plaintiff's claim encompasses an interest protected by section 1983 and the due process clause of the fourteenth amendment.
 
 A. Free Speech
 
 83
 Plaintiff briefly asserts on appeal that the trial court erred in not submitting to the jury the question whether defendants deprived plaintiff of his first amendment right to free speech. The record is so devoid of substantial evidence supporting this claim that it is not necessary to discuss the details of that evidence. It is sufficient to note that plaintiff failed to sustain his burden to show that his interest in free speech was a substantial factor in the board's decision. See Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 284-87, 97 S.Ct. 568, 574-76, 50 L.Ed.2d 471 (1977).
 
 B. Property Interest
 
 84
 In this case, plaintiff's contract of employment terminated in June of 1980. Thus, the suit challenges only the board's refusal to renew that contract once it had expired. No evidence or argument substantially supports the claim that plaintiff had any contractual or other right to the renewal of his contract. At most he had a hope or expectation of renewal. This hope or expectation did not convert his claim into a property interest. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).C. Liberty Interest
 
 
 85
 The trial court submitted plaintiff's liberty interest claim to the jury, and it was on that basis that the verdict in favor of plaintiff was rendered. On appeal, defendants argue that the court erred in failing to direct a verdict on this claim.
 
 
 86
 This court has noted that "[t]he concept of liberty recognizes two particular interests of a public employee: 1) the protection of his good name, reputation, honor and integrity, and 2) his freedom to take advantage of other opportunities." Weathers v. West Yuma County School District R-J-1, 530 F.2d 1335, 1338 (10th Cir.1976) (quoting Lipp v. Board of Education, 470 F.2d 802 (7th Cir.1972)). See also Board of Regents v. Roth, 408 U.S. 564, 573-74, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972). Thus, when the termination of a public employee is accompanied by public dissemination of the reasons for dismissal, and those reasons would stigmatize the employee's reputation or foreclose future employment opportunities, due process requires that the employee be provided a hearing at which he may test the validity of the proffered grounds for dismissal. Miller v. City of Mission, Kansas, 705 F.2d 368, 373 (10th Cir.1983); McGhee v. Draper, 639 F.2d 639, 642-43 (10th Cir.1981). The Supreme Court has made clear that, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971).
 
 
 87
 The very reason the Constitution requires procedural due process is that the dynamic of a fair hearing often alters a decisionmaker's determination.[6] Even if a hearing would not have affected the decision, once the government elects to publish its reasons, bringing to bear its immense power to legitimize the truth of those statements, due process requires that it afford the accused person an opportunity to bring to bear all the legitimate forces which influence that administrative decision. See Miller, 705 F.2d at 371-72 (citing Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976)); Owen v. City of Independence, Missouri, 560 F.2d 925, 935-37 (8th Cir.1977). By doing so, procedural due process ensures some measure of accountability for the exercise of government power.
 
 
 88
 This does not mean that the school board must be correct in its reasons for refusing to renew the plaintiff's contract. See Bishop v. Wood, 426 U.S. 341, 349, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); see also McGhee, 639 F.2d at 643. Rather, due process requires only that, where the government has made public, stigmatizing statements, it must grant at least a minimal hearing at which the employee has a fair opportunity to rebut the stigmatizing charges. Once that process is observed, then the requirements of due process are satisfied, and we cannot second-guess the government's fact determination. See Bishop, 426 U.S. at 349-50, 96 S.Ct. at 2079-80.
 
 
 89
 In the present case, although the board had no constitutional duty to give reasons for its refusal to renew the contract of this nontenured employee, it elected to do so.[7] The board prepared and read at a public meeting the following statement setting forth its reasons for nonrenewal:
 
 
 90
 We feel that the statements that have appeared in the news media that Mr. Garcia has done anything illegal or has been under any coercion on the part of the Board in an attempt to get him to do anything illegal are completely false.
 
 
 91
 We feel that Mr. Garcia is a superior fiscal agent and has served this district in a superior manner as fiscal agent.
 
 
 92
 However, Mr. Garcia's contract was not renewed because:
 
 
 93
 1. Constituents have continually expressed dissatisfaction with Mr. Garcia.
 
 
 94
 2. The conduct of the Superintendent has been detrimental to staff morale.
 
 
 95
 3. Mr. Garcia has become continuously more and more unresponsive over the years and it has become more difficult to work with him.
 
 
 96
 Record, vol. 6, Exhibit 18-B. These reasons were later published in the newspaper. The plaintiff alleges that, because of these charges, he has been unable to obtain employment comparable to his former position.
 
 
 97
 The defendants argue that this statement does not, as a matter of law, implicate plaintiff's liberty interest because it is not sufficiently stigmatizing to damage his reputation or foreclose job opportunities. This court, and those in other circuits,[8] has been struggling to define what types of charges are sufficiently stigmatizing to invoke due process. For example, in Staton v. Mayes, 552 F.2d 908 (10th Cir.), cert. denied, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977), we found that allegations of willful neglect and incompetence implicated a liberty interest. But in Abeyta v. Town of Taos, 499 F.2d 323, 327 (10th Cir.1974), we characterized comparable allegations as charges of improper job performance, and found them not to stigmatize reputation as would charges of immorality or dishonesty.
 
 
 98
 It is clear that charges of minor, correctable failures in work habits do not rise to the level of stigmatization or foreclose job opportunities. See, e.g., Weathers, 530 F.2d at 1336, 1338-40 (reasons for nonrenewal were that the teacher swore at a student, had assigned too much busy work, had not looked at a student's assignment, and gave all members of a group the same grade). However, where the charges go to the fundamental capacity of the employee to perform his or her job, a significant issue exists, and a court must submit it to the jury. See McGhee v. Draper, 564 F.2d 902, 909-10 (10th Cir.1977) (reversing directed verdict on issue of whether accusations were stigmatizing). A comparison of the relative burden of a minimal due process hearing and the very substantial damage which can be imposed on an employee by unjustified stigmatization leads to the conclusion that the threshold case should be resolved in favor of requiring due process protection.
 
 
 99
 In reviewing the denial of a directed verdict, "the evidence and inferences from it must be viewed in 'the light most favorable to the parties for whom the jury found.' " Miller v. City of Mission, Kansas, 705 F.2d 368, 373 (10th Cir.1983) (quoting Ford Motor Credit Co. v. Milburn, 615 F.2d 892, 894 (10th Cir.1980)). While this case is not clear cut, I cannot say as a matter of law that the trial court erred in submitting the issue to the jury. The charges are such that they raise doubt about the fundamental capacity of this superintendent to be a superintendent. Indeed, the charges at issue in this case, which include claims that plaintiff had caused low staff morale and that he was difficult to work with, are similar to those found to implicate a liberty interest in Miller. 705 F.2d at 373 (liberty interest is implicated by charges that assistant police chief had created low department morale, was not respected by the officers, and had caused deterioration of the department to the extent that the officers felt they could not work with him). When coupled with proof, as in the present case, from which a jury could conclude that employment opportunities were in fact precluded by the charges, the evidence was sufficient to raise a substantial issue of whether plaintiff had been deprived of a liberty interest. See McGhee v. Draper, 564 F.2d 902 (10th Cir.1977). The trial court therefore acted properly in submitting this claim to the jury.
 
 
 100
 In summary, I would find the school board not to be immune from suit under the eleventh amendment and would affirm the trial court's actions on plaintiff's free speech, property, and liberty claims. Because the majority holds the school board to be immune from suit, I must dissent.
 
 
 
 [1]
 The pertinent part of section 1983 states:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. Sec. 1983 (1982).
 
 
 [2]
 At different points in the trial, the judge referred to the school board members as public officials and public figures. The United States Constitution, however, does not make a distinction between the two, and neither party alleges error on this ground. See infra note 4
 
 
 [3]
 In New York Times, the Supreme Court held that the constitutional guarantees of the first and fourteenth amendments require a "federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'--that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80, 87 S.Ct. at 726
 
 
 [4]
 In Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended the New York Times rule to public figures. See also Gertz v. Robert Welch, Inc., 418 U.S. 323, 342-43, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974)
 
 
 [5]
 Justice Burger, at least implicitly, also rejected the media/nonmedia distinction, since he stated that he "agree[s] generally with Justice White's observations concerning New York Times v. Sullivan." 105 S.Ct. at 2948 (Burger, C.J., concurring in judgment)
 
 
 [1]
 In another context and long before the creation of the Monell state/local function dichotomy, the New Mexico Supreme Court declared that local school boards are arms of the State of New Mexico and enjoy eleventh amendment immunity. McWhorter v. Board of Educ., 63 N.M. 421, 320 P.2d 1025 (1958). However, since the ultimate characterization is based on the substance of the relationship as determined by the Mt. Healthy/Epperson test and is a matter of federal law, the state's legal conclusion is not controlling
 
 
 [2]
 In 1974, the New Mexico legislature adopted an equalizing "formula" for funding public schools. The purpose of the formula is to equalize educational opportunities throughout the state. The total budget for a district is determined by a formula (found at N.M.Stat.Ann. Secs. 22-8-18 to -24 (1978)) which considers factors such as attendance, the number of teachers, and types of programs offered. The state then provides the funds needed to meet the budget in the amount the budget exceeds the district's local and federal revenues. The state funding, or state "guarantee," comes from the "Public School Fund" created by N.M.Stat.Ann. Sec. 22-8-14 (1978)
 
 
 [3]
 N.M.Stat.Ann. Sec. 41-4-18(A) (1978) provides: "Exclusive original jurisdiction for any claim under the Tort Claims Act [N.M.Stat.Ann. Secs. 41-4-1 to -27 (1978) ] shall be in the district courts of New Mexico. Appeals may be taken as provided by law."
 
 
 [4]
 The New Mexico Tort Claims Act waives sovereign immunity only from liability for damages "resulting from bodily injury, wrongful death or property damage" caused by negligence of public employees engaged in eight categories of activities. N.M.Stat.Ann. Secs. 41-4-4 to -12 (1978). Sovereign immunity from claims for "personal injury ... resulting from ... deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States" is waived only if the injury was caused by law enforcement officers acting within the scope of their duties. N.M.Stat.Ann. Sec. 41-4-12 (1978)
 
 
 [5]
 In finding that section 7-37-7(C)(3) does not authorize tax levies for constitutional claims, the majority also relies on the fact that the Tort Claims Act requires a school board to budget for civil rights judgments. Martinez, 748 F.2d at 1396. However, as discussed above, the Tort Claims Act only mandates that the school district budget for specified torts and civil rights judgments; it does not cover civil rights claims brought in federal court. The existence of that Act, therefore, does not support the proposition that Sec. 7-37-7(C)(3) does not authorize local tax levies to pay constitutional claims
 In addition, the majority's argument would prove too much. The logical corollary of their argument would be that because the Tort Claims Act requires school districts to budget for tort judgments, section 7-37-7(C)(3) thus does not authorize levies to pay tort judgments. This conclusion would clearly be erroneous, since the statute expressly grants such authority.
 
 
 [6]
 Indeed, we have held that it is not, as a matter of law, impossible to prove that, had a due process hearing been conducted, the result of the hearing would in fact have been different. McGhee, 639 F.2d at 646
 
 
 [7]
 In the year in which the nonrenewal decision was made, the plaintiff and the board were involved in a dispute. Plaintiff charged that the board declined renewal because of his refusal to do something he considered to be illegal, but which he alleged the board requested him to do anyway
 
 
 [8]
 A review of the case law illustrates the difficulty in determining what charges are stigmatizing. Some charges, such as those involving dishonesty or immorality, are clearly stigmatizing. One circuit has held that only such charges--those involving "moral turpitude"--can implicate a liberty interest. Bollow v. Federal Reserve Bank, 650 F.2d 1093, 1101 (9th Cir.1981), cert. denied, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982). Among the circuits which have acknowledged that other types of charges can create a serious stigma and foreclose job opportunities, the decisions have been inconsistent. Compare Huntley v. Community School Bd., 543 F.2d 979 (2d Cir.1976), cert. denied, 430 U.S. 929, 97 S.Ct. 1547 (1977) (charges of poor and ineffective leadership are stigmatizing) and Greenhill v. Bailey, 519 F.2d 5 (8th Cir.1975) (charge that plaintiff was dismissed because of lack of intellectual ability is stigmatizing) with Blair v. Board of Regents, 496 F.2d 322 (6th Cir.1974) (dismissal for failure to meet minimum standards not stigmatizing); Adams v. Walker, 492 F.2d 1003 (7th Cir.1974) (charges of incompetence, neglect of duty, and malfeasance in office not stigmatizing) and Jeffries v. Turkey Run Consolidated School District, 492 F.2d 1 (7th Cir.1974) (dismissal for highly unethical conduct not stigmatizing)